OSCAR F. BRAVO y THE MAYAGÜEZ SUGAR COMPANY, INC., demandantes y apelantes, *v.* ROBERT HEINRICH HAU SCHNABEL, ET ALS., demandados y apelados.

Núms. 8315 y 8380.—*Sometidos:* Diciembre 5, 1941. *Resueltos:* Enero 15, 1942.

*Gelpí & Gelpí*, abogados de los apelantes; *Miguel A. García Méndez y José Sabater*, abogados de los apelados.

El Juez Asociado Señor Travieso emitió la opinión del tribunal.

En abril 20 de 1916, don Arturo Hau Salguero, dueño de la hacienda "Sábalos," radicada en Mayagüez, dió dichâ finca en arrendamiento, hasta el 31 de mayo de 1929, a don Oscar F. Bravo. La cláusula *sexta* del contrato de arrendamiento leía así:

"A la terminación de este contrato, el arrendatario podrá levantar y disponer de cualquier edificio que construya o de cualquier cerca que ponga en la finca o cualquier mejora que haga en ella para su comodidad o utilidad durante el tiempo que dure este arrendamiento; pero bien entendido que de no hacerlo así, todo lo que quede en las fincas el día del vencimiento de este contrato, así como cualquier plantación o retoño que exista en las mismas, quedarán a favor del señor Hau, sin que tenga el arrendatario derecho a exigirle indemnización ni retribución alguna por ello."

En febrero 18 de 1926, los señores Hau y Bravo celebraron un nuevo contrato de arrendamiento, a vencer el 31 de mayo de 1939. La cláusula *séptima* del nuevo contrato es idéntica a la que acabamos de transcribir.

En la demanda interpuesta por Oscar F. Bravo y su cesionaria, The Mayagüez Sugar Company, Inc., contra los herederos de Arturo Hau Salguero y los nuevos arrendatarios de éstos, se alega, en substancia, lo siguiente:

Que durante más de veinte años y hasta el 31 de mayo de 1939 la hacienda "Sábalos" estuvo dedicada al cultivo de cañas de azúcar; que en 1937 el Congreso de Estados Unidos aprobó la ley denominada "Sugar Act of 1937," (50 Stat., pág. 903) por la cual se limitó la producción de azúcar en Puerto Rico, se fijó una cuota individual para cada finca bajo cultivo y se prohibió a los manufactureros moler cañas en exceso de las cuotas asignadas a cada productor; que para la cosecha de 1938 a 1939 la hacienda "Sábalos" estaba sembrada de cañas y debido a la prohibición legal "quedaron en pie por no haberse permitido su corte ni ser molidas, antes de la terminación del contrato de arrendamiento ya expuesto,

veinticinco (25) cuerdas de terreno cultivadas de cañas de azúcar con un promedio de treinta toneladas la cuerda y con un valor total de tres mil doscientos dólares''; que antes de la fecha de expiración del arrendamiento, los demandantes, creyendo que aquellas cañas que quedaban en pie y sin moler ''no eran *plantaciones* de acuerdo con la fraseología empleada en el contrato de arrendamiento,'' notificaron a los demandados que dichas cañas pertenecían a la compañía arrendataria por haber sido sembradas de buena fe y no haber podido ser cortadas y molidas por exceder de la cuota asignada a la hacienda ''Sábalos''; que los demandados insistieron e insisten en que dichas cañas les pertenecen, sin retribución alguna, de acuerdo con los términos de la cláusula del contrato antes citada.

Piden los demandantes que se dicte una sentencia o decreto declarando: (*a*) que las cañas que quedaron en pie al expirar el contrato de arrendamiento y que no pudieron ser molidas por razón de la prohibición legal, no están incluídas dentro de los términos de la cláusula *séptima,* supra, y son de la exclusiva pertenencia de la compañía demandante, y (*b*) que en caso de que los demandados quieran hacer suyas dichas cañas, deberán satisfacer a la demandante la suma de $3,200.

En su contestación y en oposición a las alegaciones de la demanda, los demandados alegan, en substancia, lo siguiente: que los demandantes pudieron haber molido las cañas en cuestión y que si no lo hicieron se debió exclusivamente a su culpa y negligencia; que desde que se estableció el sistema restrictivo de cuotas en 1934, los demandantes sabían cuál era la cuota de la hacienda ''Sábalos,'' y que si para la zafra de 1939 había cañas no molidas por haberse excedido la cuota, ello se debió a la culpa y negligencia de los demandantes; que la cláusula *séptima* del contrato de arrendamiento no puede tener otra interpretación que la que resulta del recto sentido de sus palabras, por no haber ambigüedad ni duda sobre ellas; que la palabra ''plantaciones'' unida a la de ''retoños,'' que se expresan en dicha cláusula, claramente

indican que dichas *plantaciones o retoños* son de caña de azúcar y no se refieren a otra clase de plantaciones; y que esa interpretación se robustece al considerar que la finca fué arrendada para la siembra y cultivo de cañas de azúcar, que es a lo que se ha dedicado por más de veinte, años consecutivos.

En mayo 4 de 1940 la Corte de Distrito de Mayagüez dictó sentencia declarando sin lugar la demanda y condenando a los demandantes al pago de costas, más $500 para honorarios de los abogados de los demandados. Apelaron éstos, y para sostener su recurso alegan que la corte inferior erró: (*a*) al interpretar la cláusula séptima del contrato sin tomar en consideración las variaciones y restricciones de la Ley de Azúcar de 1937; (*b*) al no considerar que dicha cláusula quedó afectada y modificada como consecuencia de la referida legislación; (*c*) al no considerar como sembradas de buena fe las cañas que quedaron en pie al finalizar el contrato, y al no evitar que los arrendatarios se enriquecieran a costa de los demandantes; (*d*) al resolver que la declaración de Guillermo Pérez era terminante y no había sido contradicha; (*c*) al apreciar la evidencia con pasión, prejuicio y parcialidad a favor de los demandados y en contra de los demandantes; y (*f*) al condenar a los demandantes al pago de $500 de honorarios, sin haberles declarado previamente culpables de temeridad. Consideraremos los seis señalamientos conjuntamente, pues todos ellos envuelven una sola cuestión fundamental que plantearemos así: asumiendo que la restricción impuesta por la Ley de Azúcar de 1937 fuera el único motivo que tuvo la arrendataria para no cortar las 25 cuerdas de cañas, ¿constituye esa restricción una causa legal suficiente para eximir a la arrendataria del cumplimiento de las obligaciones por ella contraídas bajo la cláusula séptima del contrato de arrendamiento?

■ Los términos en que está redactada dicha cláusula son tan claros y precisos que no dejan duda alguna en cuanto a la intención de los contratantes. Es evidente que la inten-

ción de las partes fué que al terminar el contrato de arrendamiento, el 31 de mayo de 1939, o antes de esa fecha, la arrendataria tendría el derecho de levantar y llevarse los edificios, las cercas y las mejoras que hubiere construído o hecho para su utilidad durante el término del arrendamiento. ¿Qué habría de suceder, si llegado el 31 de mayo de 1939, la arrendataria no había hecho uso de ese derecho? Las partes contratantes, prescindiendo de las disposiciones especiales del Código Civil aplicables a los arrendamientos de predios rústicos (artículos 1478 a 1482) estipularon en términos concisos y claros cuál habría de ser la ley reguladora de los derechos de una y otra parte, si llegare el caso en que habiendo vencido el plazo, el arrendatario no hubiese hecho uso de su derecho a llevarse los edificios, las cercas y mejoras y las plantaciones y retoños. Y con ese propósito pactaron lo siguiente:

"pero bien entendido que de no hacerlo así, todo lo que quede en las fincas el día del vencimiento de este contrato, *así como cualquier plantación o retoño que exista en las mismas,* quedarán a favor del Sr. Hau, sin que tenga el arrendatario derecho a exigirle indemnización ni retribución alguna por ello."

De no haberse pactado lo arriba transcrito, los arrendatarios entrantes, aquí demandados, hubiesen tenido la obligación de permitir a la arrendataria saliente entrar a la finca y hacer todo lo necesario para la recolección y aprovechamiento de las cañas que allí quedaron en pie al expirar el término del arrendamiento. Fué seguramente con el propósito de que la finca quedase enteramente libre al terminar el arrendamiento, sin necesidad de imponer al nuevo arrendatario la obligación de dar entrada al saliente, que las partes contratantes fijaron el 31 de mayo de 1939 como término fatal dentro del cual el arrendatario debía sacar de la finca los edificios, cercas, mejoras y plantaciones.

La causa que alega la arrendataria para explicar por qué no pudo cortar y llevarse las cañas antes del 31 de mayo de 1939, no puede ser considerada como un caso fortuito extra-

ordinario o de fuerza mayor que los contratantes no hubieran podido racionalmente prever.

La obligación contraída es clara y absoluta. Todas las plantaciones y retoños que quedaron en pie en la finca al terminarse el arrendamiento pasaron a ser propiedad del arrendador, sin obligación por parte de éste de pagar su importe.

No encontramos que la corte inferior cometiera error alguno al apreciar la declaración del testigo Guillermo Pérez Ortiz, ayudante del administrador de la "Agricultural Adjustment Administration", presentado por los demandados. Dicho testigo declaró, en substancia, que de acuerdo con la ley original de 1934 la práctica que se siguió fué la de permitir solamente la molienda de caña cubierta por cada contrato específicamente; que de acuerdo con la ley posterior, Ley de Azúcar de 1937, las participaciones proporcionales fueron asignadas bajo el nombre de la persona que tenía el control o dominio de las distintas parcelas; que ése fué el procedimiento que se aplicó en el año 1939; que la demandante pudo haber cortado y molido las 25 cuerdas que quedaron en pie en la hacienda "Sábalos," dejando en pie igual cantidad de cañas en cualquiera otra finca bajo su control, y así no hubieran perdido nada; que no hubieran cometido ningún delito moliendo esas cañas con cargo a cualquiera otra parcela; que un agricultor que tiene diferentes parcelas de terreno sembradas de caña puede llenar su cuota de cualquier terreno bajo su dominio.

En oposición a la declaración del Sr. Pérez, los demandantes ofrecieron el testimonio del Sr. Waldemar Bravo, quien declaró: que los demandantes no pudieron cortar toda la caña existente en la hacienda "Sábalos" por haberse recibido la participación proporcional de las tierras por ellos controladas con sólo cuatro semanas antes de finalizar la zafra; que el corte se inició en el mes de enero y cuando llegó la notificación ya se habían molido cañas de otras parcelas; que a la corporación demandante se le quedaron

27,000 toneladas en 900 cuerdas de caña; que durante las últimas cuatro semanas se estuvo moliendo a toda capacidad; que las cañas de "Sábalos" no estaban lo suficientemente maduras cuando se comenzó la zafra, ni cuando llegó la notificación de la cuota; que se hizo todo lo que estuvo a su alcance para moler toda la caña. A preguntas del juez el testigo contestó que no pudieron cortar toda la caña de "Sábalos" por el hecho de que toda la caña no estaba madura. Repreguntado por la defensa, contestó: que cuando las cañas estuvieron de corte se inició el corte en "Sábalos"; que cuando expiró el contrato ya no había caña nueva; y que en mayo no hay caña verde.

La declaración del Sr. Bravo no desvirtúa ni contradice en nada la del Sr. Pérez. Bravo admite que a la demandante le hubiera sido legalmente posible cortar y moler todas las cañas de "Sábalos," con cargo a otras parcelas, pero alega un nuevo motivo para justificar el hecho de que no se molieran antes de terminar el arrendamiento, y es que las cañas no estaban maduras cuando se recibió la notificación de las cuotas.

La corte inferior no erró al resolver que la alegación básica de la demanda, o sea la de que las 25 cuerdas de caña "quedaron en pie por no haberse permitido su corte ni ser molidas, antes de la terminación del contrato de arrendamiento," no está sostenida por la prueba.

■ Opinamos que la suma de $500 impuesta a los demandantes para honorarios de los abogados de los demandados es excesiva, si se tiene en cuenta que la cuantía del pleito es solamente $3,200 y que son los demandados los que han de recibir todo el beneficio de esa suma. Los honorarios deben ser reducidos a la suma de $300.

■ Los demandantes han apelado también de la resolución dictada por la corte inferior en marzo 18 de 1941, aprobando el memorándum de costas sometido por los demandados y que ascendía en total a la suma de $48. La corte inferior lo redujo a $43.

El recurso carece de méritos. La suma de $20 concedida al abogado de los demandados para cubrir sus gastos de viaje de ida y vuelta de San Germán a San Juan, para la vista de una moción de traslado del pleito a Mayagüez, es a nuestro juicio razonable. Igualmente lo es la de $8 pagada al Administrador Auxiliar de la A.A.A: por sus gastos de viaje de San Juan a Mayagüez. Las demás partidas, referentes a notificaciones y dietas de testigos, se ajustan a la ley. El recurso debe ser desestimado.

Por las razones expuestas *debe modificarse la sentencia recurrida, reduciendo a $300 la suma concedida para honorarios de abogado, y así modificada confirmarse. Debe confirmarse igualmente la resolución aprobando el memorándum de costas.*

El Juez Asociado Sr. Todd, Jr., no intervino.