SAN MIGUEL FERTILIZER CORP., demandante y recurrida, *v.* PUERTO RICO DRYDOCK & MARINE TERMINALS, demandada y recurrente.

*Número:* R-64-185        *Resuelto:* 4 de mayo de 1967

---

*Fiddler, González & Rodríguez* y *Rafael R. Vizcarrondo,* abogados de la recurrente; *Francisco Ponsa Feliú,* abogado de la recurrida.

Sala Primera integrada por el Juez Asociado Señor Pérez Pimentel como Presidente de Sala y los Jueces Asociados Señores Hernández Matos, Dávila y Ramírez Bages.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

Se trata de la interpretación de un contrato de descarga de material a granel traído a Puerto Rico por barco. La cuestión a resolver es si bajo tal contrato la empresa que se obligó a realizar las operaciones de descarga, a través de sus facilidades, puede cobrar las partidas de atraque y muellaje. El cobro de dichas partidas fue autorizado por la Comisión de Servicio Público, a través de su orden de 10 de enero de 1957. Por las razones expuestas a continuación concluimos que no, y que la sentencia del tribunal de instancia a ese efecto debe confirmarse.

### La Controversia

Con anterioridad al año 1951, la recurrida, San Miguel Fertilizer Corporation (designada en lo sucesivo como San Miguel) recibía el material a granel que importaba a través de las facilidades de la Puerto Rico Lighterage. En 14 de julio de 1951, San Miguel y la recurrente, Puerto Rico Drydock & Marine Terminals, Inc., (designada en lo sucesivo como Drydock) suscribieron un contrato que en lo pertinente a la cuestión bajo nuestra consideración dispone que:

"1.—Que Drydock tiene actualmente arrendado de la Marina de los Estados Unidos de América el Dique de Carena propiedad de ésta con todas sus facilidades adyacentes.

"2.—Que San Miguel recibe con frecuencia, y por la vía marítima material a granel . . .

"3.—Que ambas partes tienen convenido entre sí un contrato para la descarga de todo el material a granel que por la vía marítima reciba SAN MIGUEL de aquí en adelante, todo ello a través de las facilidades arriba mencionadas y de las cuales DRYDOCK es arrendataria, . . ."

"CLÁUSULAS

"PRIMERA: SAN MIGUEL se obliga a descargar todo el material a granel que reciba por la vía marítima de aquí en adelante . . . a través de las facilidades de DRYDOCK, y DRYDOCK, por su parte, se obliga a descargar todo el material a granel que reciba SAN MIGUEL por la vía marítima desde esta fecha en adelante, . . .

"SEGUNDA: DRYDOCK tendrá derecho a cobrar, y SAN MIGUEL vendrá obligada a satisfacerle dentro de un período razonable después de la descarga, el tipo convenido de $1.20-1/2 (un dólar veinte centavos y medio) por cada tonelada de 2,000 libras de material a granel de SAN MIGUEL que sea descargada por DRYDOCK bajo las condiciones que aquí quedan estipuladas.

"TERCERA: La descarga por DRYDOCK será realizada desde los barcos en que arribe el material hasta los embudos que DRYDOCK tiene ya específicamente instalados para este propósito y hasta cualesquiera otras facilidades que DRYDOCK instale en el futuro previo acuerdo con SAN MIGUEL.

"QUINTA: La vigencia del presente contrato será la misma que la del contrato de arrendamiento no vencido que actualmente tiene DRYDOCK con la Marina de los Estados Unidos sobre las mencionadas facilidades, y estará sujeto a las condiciones y contingencias del mismo; disponiéndose, sin embargo, que cualquiera de ambas partes, en cualquier momento, tendrá derecho a solicitar de la otra una revisión o reajuste del tipo convenido de un dólar veinte centavos y medio ($1.20-½) por tonelada, siempre que ello esté justificado por un aumento o disminución en los costos de descarga."

En 8 de febrero de 1955 San Miguel y Drydock formalizaron un convenio donde acordaron aclarar e instrumentar la cláusula quinta del contrato celebrado en 14 de julio de 1951. Dicha cláusula se refiere, en lo pertinente, a la deter-

minación de la compensación por el servicio de descarga fijado a base de tanto por tonelada, sujeto a revisión o reajuste debido a aumento o disminución en los costos de descarga. A ese efecto se señalaron en este convenio complementario las partidas de costos a ser considerados en la determinación del tipo de descarga por tonelada. Además, se convino el procedimiento a seguirse para la determinación de futuros tipos de descarga por tonelada. Las partidas a que hemos hecho referencia son los jornales de estibadores, capataces, operadores de grúas y fogoneros, otros misceláneos, jornales por limpieza de área, por tiempo perdido (operadores de grúas-fogoneros), una partida por aceite combustible, mantenimiento y reparación, depreciación, y, por último, beneficios.

En 29 de agosto de 1958 inició San Miguel en el Tribunal Superior, Sala de San Juan, un recurso de sentencia declaratoria alegando que el 14 de julio de 1951 suscribió el referido contrato; que el mismo fue modificado mediante documento otorgado por las partes en 8 de febrero de 1955; que ha surgido y existe entre las partes contratantes una controversia real y cierta en cuanto al derecho de Drydock a cobrarle a San Miguel, en adición a las partidas consignadas en el contrato vigente, según ha sido modificado, ciertas partidas por concepto de atraque y muellaje, siendo la contención de San Miguel que nunca ha estado ni viene obligada a pagar a Drydock las mencionadas partidas ni dinero alguno por dicho concepto, mientras que la contención de esta última es que aquélla siempre ha estado obligada a hacerle tales pagos.

En su contestación, Drydock alegó que la obligación de San Miguel de pagar por los conceptos y actos de atraque y muellaje no surge del contrato celebrado según fue enmendado ya que éste nada dispone sobre ni cubre los conceptos y actos de atraque y muellaje. Indica que dicha obligación surge de la Ley de Servicio Público de Puerto Rico, de las órdenes y resoluciones de la Hon. Comisión de Servicio Pú-

blico de Puerto Rico y de los contratos de fletamento de barcos (*charter party agreements*) existentes entre San Miguel y los dueños de los barcos que traen los materiales que importa aquélla ya que específicamente disponen que los cargos por concepto de atraque y muellaje serán de cuenta de los consignatarios y/o dueños de la carga.

El tribunal de instancia resolvió que San Miguel no venía obligada a pagarle a Drydock los cargos de atraque y muellaje. Llegó a esta conclusión basándose principalmente en la conducta de las partes al poner en vigor el contrato celebrado por ellos. Concluyó, además, que San Miguel ni Drydock eran partes en los referidos contratos de fletamento y por lo tanto dichos contratos no podían obligar a San Miguel a pagar por las partidas de atraque y muellaje.

### Los Apuntamientos de Drydock

En apoyo de su recurso de revisión, Drydock apunta los siguientes cinco errores en que alega incurrió el tribunal de instancia:

I—Incidió dicho tribunal al resolver que San Miguel no viene obligado a pagar a Drydock el atraque y muellaje en virtud de los contratos de fletamento.

El tribunal de instancia concluyó que "Los contratos de arrendamiento de barcos . . . no crean ni derechos ni obligaciones entre las partes litigantes por ser dichos contratos obligaciones entre otras partes contratantes, no siendo partes en los mismos ni San Miguel Fertilizer ni Puerto Rico Drydock; el Artículo 1209 del Código Civil, Edición 1930, 31 LPRA Sec. 3374 establece que 'los contratos sólo producen efecto entre las partes que los otorgan y sus herederos; . . .' ".

Arguye Drydock que San Miguel viene obligada a cumplir la condición de pago de atraque y muellaje provista en los referidos contratos de fletamento, primero porque San

Miguel era parte en los mismos pues éstos casi siempre los suscribía SMH Trading Corporation y ésta y San Miguel son el mismo ente jurídico; y segundo, porque aun no siéndolo, San Miguel está impedida de alegar lo contrario, ya que era el beneficiario de tales contratos y al aceptarlos y beneficiarse de los mismos venía obligada a asumir la obligación de pagar atraque y muellaje provista en esos contratos. *Ramírez Ortiz v. Gautier Benítez*, 87 D.P.R. 497 (1963).

No tiene razón. La prueba no demuestra que San Miguel y SMH Trading Corporation fuesen el mismo ente jurídico. El hecho de que los nombres fuesen similares, que el Sr. Marcelino San Miguel fuese accionista de ambas corporaciones, que en una ocasión SMH Trading Corporation le escribiese a Drydock en papel timbrado de San Miguel y que las circunstancias indujesen a Drydock a creer que San Miguel y SMH Trading Corporation eran una misma persona, no es la prueba fuerte y robusta que justificaría rasgar el velo corporativo de SMH Trading Corporation. Dicha prueba no justifica concluir que ésta era un "alter ego" o conducto instrumento económico pasivo de San Miguel o que hay entre ellas tal identidad de intereses y propiedad que ambas se hallan confundidas, o que el sostener la ficción de dos entidades distintas en este caso equivale a sancionar un fraude o promover una injusticia o que el propósito de estas dos estructuras corporativas es evadir el cumplimiento de una obligación estatutaria o derrotar la política pública, justificar la inequidad, proteger el fraude o defender el crimen. *South P.R. Sugar Corp. v. Junta Azucarera*, 88 D.P.R. 43 (1963); *J. E. Candal & Co. v. Rivera*, 86 D.P.R. 508 (1962); *Sucn. Pérez v. Gual*, 76 D.P.R. 959 (1954); *Cruz v. Ramírez*, 75 D.P.R. 947 (1954).

No hay duda que San Miguel era un beneficiario de los contratos de fletamento por virtud de los cuales se transportaba desde distintos lugares en Europa y en Estados Unidos

materia prima a granel consignada a San Miguel para ser utilizada en su fábrica de abono, material que San Miguel recibió y aceptó al descargarse cada barco en las facilidades de Drydock. Necesariamente San Miguel tenía que pagar por el servicio de transportación. Esta obligación incluía la de pagar atraque y muellaje bajo aquellos contratos que disponían que el dueño o consignatario de la carga pagase estos derechos. Pero ninguno de unos 50 contratos de fletamento admitidos en evidencia impone la obligación de pago del derecho de atraque al dueño de la carga o consignatario y sólo en ocho, los llamados *Booking Contracts* es que. el cargo de muellaje es por cuenta de la carga.

Sólo en dos ocasiones aparece que San Miguel contrató directamente para la transportación del material en cuestión. Así surge de dos cartas dirigidas por González Chemical Industries, Inc., de 20 de febrero de 1958 y 3 de abril de 1959, al Sr. Carlos de Jesús, de San Miguel, creditivas del acuerdo entre estas empresas con respecto a la transportación de cierto material a granel. De ellas no surge quién se obligó a pagar por atraque y muellaje.

Resulta evidente de lo expuesto que la responsabilidad del pago de atraque y muellaje en relación con la descarga de material a granel consignado a San Miguel no recae sobre ésta por virtud de las disposiciones de los contratos de fletamento, excepto específicamente en el caso de los *Booking Contracts*. Sin embargo, como veremos más adelante, no obstante lo dispuesto en estos ocho contratos, San Miguel no viene obligado a pagar los derechos en cuestión.

II—Erró el tribunal de instancia al resolver que Drydock no tiene derecho a cobrar a San Miguel ni por atraque ni por muellaje por estar incluido en el contrato de 1951, según modificado, todo lo que aquélla tiene derecho a cobrarle a San Miguel.

III—Incidió el tribunal de instancia al concluir que durante varios años después de la vigencia de los contratos Drydock en ningún momento le reclamó a San Miguel el pago de atraque y muellaje.

Por estar íntimamente relacionados discutiremos estos apuntamientos conjuntamente.

El tribunal de instancia no incurrió en estos errores excepto que, en cuanto al tercero, la realidad es que en 8 y 15 de octubre de 1952 Drydock facturó a San Miguel por una de estas dos partidas, es decir por atraque.

En apoyo de estos apuntamientos, Drydock (A) arguye que el contrato en cuestión no cubre todo cuanto tiene derecho a cobrar pues éste sólo se refiere a sus servicios de descarga; que en el contrato no se consideró las partidas de atraque y muellaje a los efectos de que se pagaran o de que no se pagaran; que cualquier duda que quedara sobre si el contrato de 1951 cubre estos cargos se aclaró por el convenio complementario de 1955. En este convenio se aumentó el tipo convenido para el servicio de descarga y se especificó las distintas partidas o elementos que sumados lo componían. (B) Señala, con el fin de refutar la afirmación de que todo lo que puede cobrar está cubierto por el contrato, que San Miguel le ha pagado por otros servicios relacionados con el material a granel a que se refiere el contrato tales como pesar el material, el cambiar la carga de un costado del barco a otro (*cargo shifting*), y el limpiar las bodegas de los barcos. (C) Arguye, además, que el decir que el contrato exonera a San Miguel de pagar atraque y muellaje equivale a decir que Drydock ha hecho una donación a San Miguel ya que no estaría cobrándole por algo a lo que tiene derecho y por lo que todas las demás entidades que usan su muelle le pagan; y (D) insiste que San Miguel se enriquece injustamente al no pagar por las partidas de atraque y muellaje.

■ Procederemos a considerar los planteamientos de Drydock en el mismo orden en que han sido expuestos. A los fines de mayor claridad es necesario señalar que Drydock por voz de su funcionario José Miguel Peña definió atraque como "un cargo que se le hace al barco por amarrarse a un muelle para hacer descarga o cargar o cualquier operación; . . ." y "el cargo por muellaje es el que se le hace a la carga o al consignatario, . . . por pasar y hacer uso de las facilidades del muelle."

Sobre este aspecto declaró el Sr. Carlos R. de Jesús, funcionario de San Miguel que "Por muellaje se entiende el paso de la mercancía a través de las facilidades de un muelle . . . Eso se relaciona con la mercancía para usar la facilidad de un muelle." Declaró, además, que "Atraque es una carga directamente al navío por usar las facilidades de atraque al muelle."

—A—

Primeramente es necesario indicar la norma de interpretación prescrita a los efectos de terminar el alcance del contrato en cuestión y más específicamente a los efectos de determinar si el cargo por el servicio de descarga provisto en el mismo incluye o no incluye los derechos de atraque y muellaje.

■ El Art. 1234 del Código Civil, 31 L.P.R.A. sec. 3472, dispone que:

"Para juzgar de la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato."

En el caso de *Rutledge* v. *Gill*, 78 D.P.R. 698, 706 (1955), señalamos que:

". . . Para juzgar de la intención de los contratantes, deberá atenderse principalmente a los actos de éstos, coetáneos y posteriores al contrato y si alguna cláusula de un contrato admitiere

diversos sentidos, deberá entenderse en el más adecuado para que produzca efecto. Además, las cláusulas de los contratos deberán interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas. Arts. 1234, 1236 y 1237 del Código Civil (ed. 1930). *Caballero* v. *Kogan,* 73 D.P.R. 666."

■ (1) Veamos el contrato celebrado por las partes. En él se expone que la Marina de los Estados Unidos le ha arrendado a Drydock un dique de carena con todas sus *facilidades* adyacentes y que las partes han acordado que se descargue el material a granel que reciba San Miguel a través de las *facilidades* mencionadas. En la cláusula primera San Miguel se obliga a descargar el material a granel que reciba a través de las facilidades de Drydock. En la segunda cláusula se señala el tipo convenido a ser satisfecho por la descarga. En la tercera cláusula se establece que *la descarga será realizada desde los barcos en que arribe el material hasta los embudos que Drydock tiene instalados para este propósito* y hasta cualesquiera otras *facilidades* que Drydock instale en el futuro, previo acuerdo con San Miguel.

Como se podrá apreciar, en el contrato se hace continua referencia al hecho de que el material a granel que reciba San Miguel será descargado a través de las *facilidades* de Drydock y se señala la forma en que dicha descarga será realizada.

Esa continua referencia a que la descarga se realizará a través de las facilidades de Drydock tiende a indicar que las facilidades incluyen (1) el que los barcos sean amarrados al muelle y (2) el uso de las facilidades del muelle.

En relación a lo anterior, declaró el Sr. Peña como sigue:

"P. Señor Peña, ¿para la operación de descarga hay que usar el muelle?

R. Bueno, naturalmente el barco tiene que estar atracado al muelle.

P. La pregunta es que si hay que usar el muelle.

R. No es imprescindible pero hace más fácil la descarga si está atracado.

P. ¿Siempre usan o no usan el muelle?

R. Lo usan.

P. ¿Siempre lo han usado?

R. Siempre lo han usado."

(2) El contrato que provoca esta controversia, como hemos señalado, fue otorgado en 14 de julio de 1951 por lo que de ser correcta la posición de Drydock desde esa fecha ella podía reclamarle a San Miguel las partidas que ahora le reclama. Sin embargo, sus actos no sostienen su posición. Veamos. No fue en la primera oportunidad que se tuvo que se facturó a San Miguel por las partidas de atraque y muellaje sino que ello se hizo por primera vez alrededor de 15 meses luego de celebrado el contrato de descarga. En esta ocasión no se incluyó en las facturas ambas partidas sino sólo la de atraque. Para mayor precisión este incidente ocurrió por primera vez el día 8 y por segunda vez el día 15 de octubre de 1952. Inmediatamente, es decir, en 21 de octubre de 1952, San Miguel objetó a que se incluyera en las facturas cargo alguno por atraque.

Hasta el 8 de febrero de 1955, que es cuando se enmienda el contrato de 1951 para aumentar el cargo por el servicio de descarga, no se había vuelto a requerir el pago de atraque ni se había cobrado en ocasión alguna por muellaje. Tenemos, pues, que durante el período comprendido entre el 14 de julio de 1951 y el 8 de febrero de 1955 no se reclamó en ocasión alguna la partida de muellaje, es decir, no se incluyó en las facturas dicha partida y la partida de atraque sólo se incluyó en dos facturas (en las facturas del 8 y del 15 de octubre de 1952).

De estos actos de las partes resulta que éstas entendían que el contrato de descarga de material a granel a través de las facilidades de Drydock celebrado en 1951 impedía que se

cobrara, en adición a lo estipulado en el mismo, por atraque y muellaje, es decir, por amarrar los barcos que trajeron este material para San Miguel al muelle y por el uso de las facilidades del muelle.

Drydock, como hemos apuntado, señala que el convenio complementario otorgado en 1955 disipa toda duda que pueda haber sobre si el contrato cubre o no las partidas de atraque y muellaje. Así tenemos que si Drydock hubiera entendido que ahora con dicha cláusula era claro su derecho a cobrar las partidas de atraque y muellaje, era de esperarse que las cobrase y que de no pagársele hiciese valer su "claro derecho". Sin embargo, no es hasta pasado más de un año de la fecha del convenio que por primera vez—desde 1951—Drydock notifica a San Miguel que se le va a cobrar por muellaje.

En síntesis, veamos lo que ocurre luego de otorgado el convenio complementario. San Miguel presentó en evidencia un grupo de facturas que cubren el período de 5 de noviembre de 1952 a 29 de septiembre de 1955. En este grupo de facturas hay 14 que fueron enviadas a San Miguel luego de celebrado el convenio de 1955. En ellas no se incluyó cargo alguno por atraque y muellaje. De esto se desprende que luego de otorgado el convenio de 1955 Drydock no intentó cobrarle a San Miguel por atraque y muellaje en las primeras oportunidades que tuvo.

Es en 1956 que San Miguel recibe una factura donde se le cobra atraque por tercera vez desde que se otorgó el contrato en 1951 y por primera vez desde la fecha del convenio de 1955. Dicha factura *no la envió Drydock* sino otra compañía, es decir, la Southern Steamship Co. Parece ser que Drydock le cobró a esta compañía por el atraque de uno de sus barcos y que ésta trató de pasarle dicho cargo a San Miguel. San Miguel no pagó por dicha partida de atraque y lo que hizo fue requerir de Drydock que la acreditara directamente a la Southern Steamship Co.

Es a través de la carta de 20 de marzo de 1956 que Drydock por primera vez notifica a San Miguel que le va a cobrar por muellaje y es en 30 de abril de 1956 que se envió la *primera* factura que incluye muellaje. Obsérvese que ha transcurrido más de un año desde la fecha de la estipulación.

En cuanto a la partida de atraque es a través de las facturas de 30 de abril, 7 de mayo y 10 de mayo de 1956 que Drydock le cobra este cargo a San Miguel por primera vez desde el incidente de 1952. Obsérvese que también ha transcurrido más de un año de otorgada la estipulación.

Es con posterioridad a las tres facturas a que hemos hecho referencia, que en las facturas subsiguientes se incluyen las partidas de atraque y muellaje. San Miguel no pagaba estas partidas sino que las deducía de las facturas y pagaba la diferencia.

(3) Drydock nos explica su falta de diligencia en gestionar el pago de los derechos que ahora reclama, señalando que para la fecha de celebrarse el contrato la costumbre era cobrar dichos cargos, directamente al dueño o agente del barco y que no fue hasta que los barcos empezaron a negarse a pagar atraque y muellaje que Drydock trató de cobrarle a San Miguel, en 1952. Luego de este intento de cobro no se volvió a tratar de cobrarle a San Miguel hasta el 1956 debido a que hubo una promesa de parte de oficiales de San Miguel al efecto de que instruirían a SMH Trading Corporation para que no aceptara más *charter party agreements* donde los cargos por atraque y muellaje fueran por cuenta de los consignatarios para que Drydock pudiera volver a cobrarle directamente a los barcos. "Pero cuando pasaron *tres años* y los oficiales de Drydock vieron que los barcos decían que los *charter party agreements* seguían igual éstos optaron por volver a cobrarle a San Miguel". [1]

_____

[1] Si la primera ocasión en que se cobró por la partida de muellaje fue en 1956 difícilmente es cierta la aseveración de que se optó por *volver*

La anterior explicación de la dilación de Drydock en reclamar los cargos de atraque y muellaje no encuentra apoyo en los 50 contratos de fletamento presentados en evidencia los que cubren el período de 1956 a 1960. Tomando dichos contratos como representativos de los contratos de fletamento mediante los cuales se regulaba la transportación del material a granel que recibía San Miguel aparece de ellos que en sólo 11 ocasiones el fletador era la SMH Trading Corporation. De manera que como en su gran mayoría los fletadores eran empresas distintas de SMH Trading Corporation, no existía razón alguna para que Drydock esperase que las alegadas instrucciones a SMH Trading Corporation surtiesen el efecto que Drydock esperaba, es decir, el efecto de que Drydock pudiera volver a cobrar las partidas mencionadas directamente a los barcos. Es más, el hecho que Drydock esperase ese cambio en los referidos contratos indicaría que no consideraba que tenía derecho a cobrarlo a San Miguel.

Drydock nos dice en una parte de su alegato que la promesa en cuestión fue al efecto de que se instruiría a SMH Trading Corporation para que no aceptara más *charter party agreements* donde los cargos fueran por cuenta de los consignatarios, mientras que en otra nos dice que la promesa fue al efecto de que San Miguel no aceptaría más contratos de fletamento donde atraque y muellaje fuera por cuenta de San Miguel. Puede verse que entre estas dos aseveraciones hay una manifiesta contradicción. La prueba presentada a este efecto fue el testimonio del Sr. Peña, ejecutivo de Drydock. Éste lo que testificó fue que el Sr. Martínez, funcionario de San Miguel, le ofreció dar instrucciones a SMH Trading Corporation para que se pudiera cobrar directamente a los

---

a cobrarla ya que no se había cobrado antes. En todo caso lo que se optaría por volver a cobrar sería atraque ya que como hemos visto éste sí se cobró en 1952.

barcos. En el mismo sentido Drydock dirigió una carta de fecha 20 de febrero de 1956 a San Miguel.

Además, si como hemos dicho, consideramos los contratos de fletamento como representativos de los que se hacían para transportar mercancía consignada a San Miguel, encontramos que en la gran mayoría de ellos el cargo corre por cuenta del fletador y no del consignatario.

Como hemos señalado, en 1952 no se reclamaron las partidas de atraque y muellaje sino sólo una de ellas, es decir, atraque, por lo que el argumento de Drydock explicativo de su dilación en reclamarlas sería sólo efectivo en cuanto a atraque y no en cuanto a muellaje.

(4) Procede señalar un incidente, que encontramos persuasivo, el cual surge del exhibit 12 del demandante y del testimonio del Sr. Carlos R. de Jesús, Vicepresidente de San Miguel. Se compone este exhibit de 5 facturas, 4 de ellas por descarga de *material en saco*; en tres de ellas se cobra muellaje y en una se cobra tanto atraque como muellaje (nótese que el contrato entre las partes no cubre la descarga de material en sacos). La factura restante es por descarga de *material a granel* del vapor S/S GERMA. Pues bien, una de las cuatro facturas a que hemos hecho referencia (por descarga de material en sacos) es también por descarga hecha del vapor S/S GERMA y es de la misma fecha que la factura por descarga de material a granel, es decir, de fecha 11 de octubre de 1955 (luego de otorgado el convenio de 1955). Pareciera, pues, que en una misma fecha y de un mismo barco se descargó tanto material en saco como material a granel. En el caso de descarga de material en saco se facturó por muellaje, sin embargo en el caso de la descarga del material a granel no se facturó por muellaje—tampoco se cobró atraque—esto a pesar de que, como hemos apuntado, el material se descargó del mismo barco en la misma fecha y estando en vigor la estipulación de 1955. Así vemos que luego de dicha

estipulación y en esta ocasión, en la operación de descarga de material a granel—cubierta por el contrato—no se cobró ni atraque ni muellaje mas en la operación de descarga de material en saco—no cubierta por el contrato—se cobró muellaje.

(5) El Sr. Marcelino San Miguel testificó que él fue uno de los organizadores de Abarca Drydock, que luego pasó a ser la recurrente; que para inducir a San Miguel a cambiar la descarga del material a granel de Puerto Rico Lighterage a Abarca Drydock, se acordó que las condiciones del contrato serían idénticas a las que San Miguel tenía concertadas con la Puerto Rico Lighterage; que a Puerto Rico Lighterage no le pagaba atraque y muellaje. A esos efectos se presentó en evidencia una factura de esta última empresa por servicios de descarga la cual no incluía el cobro de los derechos de atraque ni de muellaje. Esta prueba no fue controvertida.

—B—

Como hemos indicado, Drydock refuta la afirmación de que todo lo que tiene derecho a cobrar está cubierto por el contrato. Señala que San Miguel le ha pagado por otros servicios relacionados con el material a granel a que se refiere el contrato, tales como por pesar dicho material, por cambiar la carga de un lado a otro del barco y por limpiar las bodegas de los barcos.

Procedía cobrar por tales servicios ya que, por su naturaleza, no pueden considerarse tan incidentales a, o parte del, servicio de descarga convenido en el contrato objeto de la controversia en este caso, como lo son el que los barcos se amarren al muelle y el uso de las facilidades del muellé.

De los hechos, actos y demás circunstancias relatados, surge con meridiana claridad que la intención de las partes al otorgar el contrato fue que éste comprendiera los ·actos o conceptos de atraque y muellaje.

—*C*—

A la luz de la prueba presentada y en vista de lo expuesto previamente, el argumento al efecto de que el exonerar a San Miguel de pagar a Drydock los derechos de atraque y muellaje equivale a decir que ésta le hizo una donación a aquélla, carece de méritos.

—*D*—

■ La aseveración de que San Miguel se ha enriquecido injustamente al no venir obligado a pagar los referidos derechos se basó en el supuesto de que San Miguel, al informarle a las empresas navieras concernidas que ella se encargaría de pagar atraque y muellaje obtuvo algún beneficio económico de ello. No se presentó prueba alguna que sostenga esta afirmación. Además, no se justifica en este caso la aplicación de la doctrina sobre enriquecimiento injusto. *Silva* v. *Comisión Industrial,* 91 D.P.R. 891 (1965).

IV—Erró el tribunal a quo al concluir que para la fecha en que se otorgaron los contratos la costumbre era que el atraque y muellaje se le cobraba a los consignatarios o agentes de los barcos.

Señala Drydock que, según el testimonio de su ejecutivo, Sr. Peña, la costumbre para la época en que se otorgaron los contratos en cuestión era que los referidos cargos se cobraban a los barcos y no a los consignatarios, razón por la cual no se mencionaron en dichos contratos.

La prueba sobre este particular fue el testimonio del Sr. Peña al efecto de que la costumbre era que el atraque y muellaje se le cobraba al dueño o agente del barco de manera que la anterior conclusión del tribunal de instancia no es del todo correcta. Sin embargo, el testimonio no controvertido del Sr. Marcelino San Miguel fue en el sentido de que él fue uno de los organizadores de Abarca Drydock y que hubo

negociaciones para inducirlo a trasladar su negocio de descarga de la Puerto Rico Lighterage, donde no pagaba atraque y muellaje, a las facilidades de Drydock por lo que no es ilógico concluir que las partes entendieran que bajo el contrato en controversia el cargo por el servicio de descarga incluía los derechos de atraque y muellaje. Además, dada la conducta de las partes en relación con la administración del contrato en cuestión, según ha quedado previamente expuesta, la posible falta de exactitud en esta conclusión del tribunal de instancia no afecta ni requiere que variemos nuestro dictamen confirmatorio de la sentencia de dicho tribunal en este caso.

V—Incidió el tribunal de instancia al imponer a Drydock la suma de $300 por concepto de honorarios de abogado.

■ Respecto a este particular hemos resuelto que la imposición de honorarios de abogado es discrecional en el tribunal sentenciador y que no revisaremos la determinación del tribunal de instancia en ese sentido a menos que los autos demuestren que se ha cometido un abuso de discreción. En este caso, tomando en consideración todas sus circunstancias, entendemos que el tribunal sentenciador no abusó de su discreción. *Montañez Cruz* v. *Metropolitan Cons. Corp.*, 87 D.P.R. 38 (1962); *Wolf* v. *Neckwear Corporation*, 80 D.P.R. 537 (1958); *Autoridad sobre Hogares* v. *Colón*, 73 D.P.R. 215 (1952); *Giráu* v. *González*, 73 D.P.R. 410 (1952); *Rivera* v. *Meléndez*, 72 D.P.R. 432 (1951); *Torres* v. *Biaggi*, 72 D.P.R. 869 (1951); *Cerra* v. *Motta*, 70 D.P.R. 861 (1950).

*Por lo anteriormente expuesto, se confirmará la sentencia dictada en este caso por el Tribunal Superior, Sala de San Juan, en 9 de julio de 1964.*