Asociación Azucarera Cooperativa Lafayette, demandante y recurrida, *v.* Agustín Aramburu, demandado y recurrente.

*Número:* R-69-78      *Resuelto:* 16 de octubre de 1970

*Antonio Figueroa Rivera,* abogado del recurrente; *Luis Domínguez Rovira,* abogado de la recurrida.

EL JUEZ ASOCIADO SEÑOR MARTÍNEZ MUÑOZ emitió la opinión del Tribunal.

Mediante escritura pública Núm. 171 otorgada ante el notario Luis Domínguez Rovira el 19 de julio de 1960 la Asociación Azucarera Cooperativa Lafayette cedió en subarrendamiento a don Agustín Aramburu un predio de terreno compuesto de 225.43 cuerdas radicado en el barrio Algarrobos de Guayama por un canon de $8,308.90 anuales, pagadero por trimestres adelantados a razón de $2,077.22 cada trimestre los días primero de julio, octubre, enero y abril de cada anualidad, pactando las partes que Aramburu pagaría, en adición, las contribuciones territoriales de la finca, así como la contribución de riego. Se fijó un término de cinco años al contrato contados a partir del 1ro. de julio de 1960 a cuya fecha retrotrayeron sus efectos, y a vencer el 1ro. de julio de 1965. Aramburu convino expresamente que el predio de terreno tomado en subarrendamiento sería dedicado preferentemente al cultivo de caña de azúcar y que todas las cañas cultivadas, cosechadas y producidas serían exclusivamente molidas en la factoría azucarera denominada "Central Lafayette" de Arroyo, propiedad de la Asociación, durante todas y cada una de las zafras cubierta por el término de duración del contrato. Aramburu se obligó, además, a abrir una cuenta especial de ahorros en el Banco de Ponce, Sucursal de Arroyo, mediante el depósito de $8,308.90 cuya suma y cuenta de ahorros quedaría pignorada a favor de la Asociación para garantizarle el pago de los cánones y el fiel cumplimiento de todas las cláusulas y

condiciones del contrato, debiéndosele hacer entrega a ésta de la correspondiente libreta, la infracción de cuya condición daría lugar a su rescisión.

La referida escritura fue otorgada en cumplimiento de lo acordado por las partes en un documento privado suscrito por ellas el 19 de abril de 1960.

La cláusula quinta de la escritura Núm. 171 lee así:

"Quinta: Queda claramente convenido que no obstante la fecha fijada para el vencimiento del subarrendamiento aquí pactado, don Agustín Aramburu, por virtud de la presente se compromete y obliga a entregar a la subarrendadora, 'La Asociación', los terrenos dedicados a caña que cultive dicho señor Aramburu a medida que vaya efectuando el corte y recolección de las cañas en el último año de la vigencia del presente contrato, siendo claridad [sic] que quedarán a beneficio de la finca o predio objeto del presente contrato todas las mejoras que se introduzcan, hagan o verifiquen, cualquiera que fuera su naturaleza, incluyendo los retoños y otras plantaciones cualesquiera, sin que tenga derecho a indemnización alguna por tales mejoras que queden en dicho predio a la expiración del presente contrato. Dicho don Agustín Aramburu deberá conservar y entregar, en el mismo estado en que se encuentran en la actualidad las cercas existentes en el predio subarrendádole, absteniéndose de moverlas de sus respectivos sitios de emplazamiento, especialmente, las cercas establecidas en las colindancias de la finca principal."

El 14 de febrero de 1965, ya entrado en el tercer trimestre del último año del contrato, la Asociación le cursó a Aramburu una carta cuyo texto lee como sigue:

"Agradeceremos se sirva ordenar al encargado de su finca en Arroyo para que vaya entregando según vaya efectuando el corte de las cañas, a nuestro empleado Sr. Enrique Pagán."

El 22 de febrero de 1965 Aramburu entregó a la Asociación ciento diez cuerdas y el remanente, o sea 115.43 cuerdas, el 25 de marzo de 1965. Desde esas dos entregas la Asociación, según determinación de hecho del tribunal sentenciador, asumió exclusiva y plena posesión y control de los terrenos

y procedió de inmediato a emprender su acondicionamiento, así como el cultivo de las raíces de la caña utilizando para ello el servicio de riego, quedando Aramburu desvinculado por completo de su posesión, control y utilización.

Fue con motivo de estas entregas que surgió entre la Asociación y Aramburu la controversia que fue objeto de adjudicación por el tribunal sentenciador. Por un lado la Asociación entendía que Aramburu venía obligado a pagarle los cánones sobre toda la finca subarrendada correspondientes a los últimos trimestres—enero a marzo y de abril a junio 30 de 1965—las contribuciones territoriales y la contribución de riego de toda la última anualidad 1964–1965.

Por otro lado Aramburu sustentaba el criterio que la fecha de expiración del contrato—cinco años a partir del 1ro. de julio de 1960 y a vencer en igual día y mes del año 1965—estipulado en la cláusula tercera de la escritura Núm. 171—había quedado modificada por la cláusula quinta disponiendo para la entrega adelantada de la finca, quedando establecida como fecha de expiración del contrato, la de la entrega a la Asociación de una porción de 110 cuerdas el 22 de febrero de 1965 y el remanente de 115 cuerdas el 25 de marzo de 1965. Su posición era, pues, que venía obligado a pagar los cánones de arrendamiento y las contribuciones territoriales por toda la finca hasta el 22 de febrero de 1965, fecha en que entregó la porción de 110 cuerdas. De ahí en adelante sólo venía obligado a pagar la proporción correspondiente de esos dos conceptos sobre el remanente de 115 cuerdas hasta el 25 de marzo de 1965 en que lo entregó a la Asociación. En cuanto a la contribución de riego Aramburu sostuvo que su obligación de pagarla se extendía sólo durante el tiempo y en la proporción que la utilizó y no hasta el 1ro. de julio de 1965 como alegaba la Asociación.

La referida controversia fue planteada ante el tribunal de instancia dentro de una acción iniciada por el Banco de Ponce el 9 de agosto de 1965, bajo la Regla 19 de Procedi-

miento Civil, para obligar a la Asociación y Aramburu dilucidaran entre sí sus respectivos derechos, previamente reclamádoles, sobre el balance de la cuenta de ahorros abierta por Aramburu en dicho banco en garantía de sus obligaciones bajo el contrato de subarrendamiento con la Asociación cuyo balance, incluyendo intereses, ascendía a $9,383.61 suma que consignó en el tribunal en cheque expedido a la orden del Secretario. Contra esos fondos, a solicitud de Aramburu, el tribunal ordenó la entrega a la Asociación de $2,980.54 por concepto de ciertas partidas adeudadas sobre las cuales no existía controversia, quedando un balance de $6,103.07 en el tribunal para ser litigado por las partes.

El tribunal de instancia resolvió favorablemente a Aramburu la cuestión relativa a la contribución de riego. El tribunal adjudicó que como Aramburu había reembolsado a la Asociación la suma de $2,959.26 cubriendo la totalidad correspondiente a la última anualidad y de acuerdo con el contrato sólo venía obligado a reembolsarle a ésta a base de acres pies de agua que él utilizara o consumiera para el regadío de la finca, Aramburu tenía derecho a un crédito que se calculó en $863.10 contra la Asociación por el período posterior a las entregas de las dos porciones de terreno. La fijación de dicho crédito no ha sido impugnada en este recurso.

El presente recurso ataca la determinación del tribunal de instancia respecto a la obligación de Aramburu de pagar totalmente los cánones de arrendamiento de los últimos dos trimestres [1], y el rechazo de su alegado derecho a que se le acreditara o reembolsara la parte proporcional de la contribución territorial que anteriormente había pagado Aramburu en su totalidad por el período posterior a la entrega

---

[1] El Tribunal Superior concluyó que dicho canon era a razón de $2,032.20 por cada trimestre que era lo que la Asociación le cobraba a Aramburu ó $4,064.40 a pesar de haberse fijado dicho canon en $2,077.22 en la escritura.

de la finca. La controversia fue resuelta por el tribunal a quo en la siguiente forma:

"Toda vez que el demandado le adeuda a la demandante $4,064.40 por concepto de los cánones correspondientes a los dos últimos trimestres del subarrendamiento y nada por la contribución territorial, y la demandante viene obligada a abonarle al demandado los $863.10 que le pagó indebidamente por la contribución de riego, el demandado adeuda a la demandante el balance de $3,201.30. Procede pues, que de la suma de $6,103.07 que el demandado tiene depositada en el Tribunal para tal efecto, se descuente la suma de $3,201.30 que éste adeuda a la demandante, más las costas de este procedimiento y se le devuelva el remanente al demandado, una vez sea firme la sentencia en este caso."

Sostiene Aramburu que el tribunal a quo cometió error al condenarle a pagar a la Asociación los cánones y las contribuciones territoriales por toda la última anualidad, no obstante haber él entregado la finca antes de expirar el término de cinco años estipulado en el contrato. Arguye que al entregar anticipadamente la finca ahí mismo dejaron de existir objeto y causa en el contrato y cesaron definitivamente sus relaciones contractuales con la Asociación; que sostener lo contrario sería imponerle una penalidad sin haberse ésta pactado, concediéndole a la Asociación un enriquecimiento injusto a expensas suyas.

Aramburu interpuso recurso de revisión y accedimos a ello. Un estudio detenido de las cláusulas, condiciones y estipulaciones de las partes en la escritura de subarrendamiento nos ha convencido que las mismas están libres de ambigüedad y que difícilmente podemos eludir la conclusión de que Aramburu, tal como lo resolvió el tribunal de instancia, viene obligado a pagarle a la Asociación los cánones y las contribuciones territoriales hasta el 30 de junio de 1965 fecha acordada por las partes en términos claros y precisos para el vencimiento del contrato de subarrendamiento.

La cláusula tercera de la escritura Núm. 171 fijando el término del subarrendamiento es clara y no debe estar sujeta a interpretación pues dice así:

"Constituye el término o plazo del presente subarrendamiento, el de cinco (5) años contados a partir del día (1°) de julio de mil novecientos sesenta (1960), a cuya fecha retrotraen los efectos del presente otorgamiento, y a vencer por tanto en igual día y mes del año mil novecientos sesenta y cinco (1965), sin ulterior prórroga o renovación."

La cláusula fijando el canon, que es la segunda, dice que se lleva a efecto ". . . en consideración al pago del canon de ocho mil trescientos ocho dólares con noventa centavos ($8,308.90) anualmente, pagadero dicho canon por trimestres adelantados . . . ."

La referente a la obligación del pago de las contribuciones territoriales dispone que Aramburu ". . . y los demás subarrendatarios de los otros lotes o parcelas separadas de la finca principal, pagarán también de sus exclusivas cuentas, la totalidad de las contribuciones territoriales impuestas o que se impongan en el futuro, durante la vigencia del presente contrato de subarrendamiento . . . ."

Los términos de vigencia del contrato, la obligación sobre el pago de los cánones y la contribución territorial no sólo no ofrecen duda en cuanto a cuál fue la intención de las partes, sino que ésta, examinada a la luz de los actos de las partes anteriores, coetáneos y posteriores al otorgamiento de la escritura Núm. 171 y demás circunstancias concurrentes, coincide con el sentido literal de aquéllos.

Es un hecho admitido, adoptado en sus determinaciones por el tribunal sentenciador, que Aramburu vino en posesión material anticipada de los terrenos el día 20 de junio de 1960, es decir, con anterioridad a la fecha de vigencia del contrato de subarrendamiento. Ello fue en virtud de los términos del contrato privado suscrito por las partes el 19 de abril de 1960 que disponía en su cláusula quinta que Aram-

buru iría ". . . haciéndose cargo de la finca y continuará recibiendo del Sr. Mariani según vaya efectuando el corte de las cañas en la misma."

En el mismo contrato privado, bajo el título "Término de Subarrendamiento" se estipuló:

"El término de este subarrendamiento es de cinco (5) años, a partir de julio 1°, 1960, pero el Sr. Aramburu vendrá obligado a ir entregando según vaya efectuando el corte de las cañas durante el último año de contrato."

En otras palabras, las partes desde antes del 1° de julio de 1960 no sólo habían acordado la entrega anticipada de la finca a Aramburu, sino que como cuestión de hecho éste se hizo cargo de la misma según fue efectuando el corte de las cañas de la zafra próxima anterior sembradas y cultivadas por el anterior ocupante Sr. Mariani. Contemplaron las partes la posesión de la finca por Aramburu en fecha anterior a la vigencia del contrato. En ese mismo contrato Aramburu se obligó a entregarla durante el último año de vigencia del contrato "según vaya efectuando el corte de las cañas". Nada se dijo en el contrato privado que Aramburu pagaría renta por el período correspondiente a su posesión anterior a la vigencia del contrato. Tampoco se contempló que Aramburu tendría derecho a una rebaja en la renta por la entrega anticipada de la finca.

El pago de las contribuciones territoriales fue tratado también en el contrato privado. Se dijo allí que "Serán pagadas por el Sr. Aramburu las contribuciones sobre la propiedad . . . correspondientes al predio que subarrienda el Sr. Aramburu." Ninguna reducción por dicho renglón fue contemplado por razón de la entrega anticipada de la finca.

La escritura Núm. 171 sobre subarrendamiento fue otorgada el 19 de julio de 1960. Para esa fecha habían transcurrido tres meses desde que Aramburu firmó el contrato privado con la Asociación. No podía constituir sorpresa para él que la escritura no proveyera una rebaja, crédito o devo-

lución de los cánones de arrendamiento ni de las contribuciones territoriales. La cláusula quinta de la escritura 171 no podía ofrecer duda alguna en la mente de Aramburu que la misma recogía el sentir de las partes según aparece éste expresado y convenido en la cláusula. sexta del contrato privado.

Si se compara la forma en que las partes trataron en la escritura de subarrendamiento el pago de la contribución sobre el riego se observará que en cuanto a este renglón, distinto al pago de los cánones y la contribución territorial, las partes utilizaron una fórmula basada no en la vigencia del contrato ni en anualidades, sino "a base de los acres pies de agua que *utilice* o *consuma* en dicho predio. . . ." (Énfasis nuestro.)

Las circunstancias que surgen del récord ocurridas con posterioridad al otorgamiento de la escritura Núm. 171 no demuestran cambio alguno o duda en cuanto a cuál fue la intención de las partes. Más bien confirman los términos de la escritura Núm. 171. Una de las condiciones de la referida escritura le imponía la obligación a Aramburu de afianzar el pago de los cánones mediante depósito de $8,308.90 en una cuenta especial de ahorros en un banco pignorando la cuenta a favor de la Asociación. El incumplimiento de Aramburu de dicha condición dio base a la Asociación para informarle que daría por rescindido el contrato. El 22 de marzo de 1962 Aramburu y la Asociación otorgaron la escritura Núm. 8 sobre Renovación de Arrendamiento ante el Notario Guillermo Cintrón Ayuso. En esa escritura la Asociación convino no rescindir el contrato, sino continuarlo sujeto a ciertas condiciones, entre otras, a la condición de que Aramburu haría el depósito mencionado dentro de un plazo de 5 días. Las partes dejaron subsistentes todas y cada una de las condiciones contenidas en el contrato de subarrendamiento. Habían transcurrido ya casi dos años desde la fecha del otorgamiento de la escritura Núm. 171. Dos años durante

los cuales ninguna duda fue abrigada, o por lo menos expresada, por el Sr. Aramburu.

El Art. 1433 del Código Civil (31 L.P.R.A. sec. 4012) señala que la determinación del tiempo y la certeza del precio son características esenciales del contrato de arrendamiento. En este caso el contrato tiene un término fijo. Tiene además un precio cierto. Aramburu nos pide que le fijemos al contrato un término más corto y un precio más bajo del que fue acordado por las partes. Ello se justifica, según él, bajo la teoría de que al entregar la finca anticipadamente dejaron de existir objeto y causa en el contrato cesando desde entonces la obligación del pago proporcional de los cánones y la contribución territorial.

No podemos acceder a ello. El contrato que Aramburu firmó no tenía por objeto las 225 cuerdas de terreno consideradas de por sí. El objeto del contrato radicaba en la utilidad de la cosecha de las cañas que él habría de sembrar y cultivar. Así lo consideraron las partes en el contrato al convenir en la cláusula séptima y octava de la escritura Núm. 171 al referirse en una y en la otra que "[todas] las cañas . . . deberán ser y serán total y exclusivamente molidas . . . en la factoría . . . durante todas y cada una de las zafras cubiertas por el término de duración de este contrato . . . ." y que "[El subarrendatario] se obliga . . . a sembrar . . . y cortar . . . plantaciones de cañas de azúcar al máximo de la capacidad productiva de dicha finca, durante todos y cada uno de los años cubiertos por este contrato . . . ." Más aún. En la referida escritura sobre renovación de arrendamiento Aramburu convino:

". . . a cortar sus cañas al empezar a moler la Central Lafayette a fin de que el corte se lleve a cabo en el mismo ritmo de la molienda a fin de que ambas empiecen y terminen a la vez." (Cláusula 6, Escritura sobre Renovación de Arrendamiento, T.A., pág. 96.)

Se trata de un contrato de cinco años que le permitió a Aramburu sembrar y cosechar durante igual número de zafras o períodos agrícolas. Eso fue lo que contempló Aramburu buscando obtener el máximo de la capacidad productiva de la finca. Así expresa Manresa, *Comentarios al Código Civil Español*, Tomo X, pág. 294 (6ta. ed. 1969), comentando las disposiciones del Código sobre reducción de renta por pérdida de frutos debida a casos fortuitos extraordinarios.[2]

"Pacifizi Mazzoni, ocupándose de análogo precepto del Código italiano de 1865, dice que el derecho a percibir la renta es correlativo con la obligación de hacer gozar de la cosa y que, por lo tanto, a la disminución del goce debe corresponder la disminución de la renta. Recuérdese, añade dicho autor, que el objeto del contrato de arrendamiento no es el fundo rústico considerado en sí mismo, sino como productor; el arrendador debe entregar la cosa al arrendatario, no para que meramente la tenga, sino ut frui possit; de suerte, que las cosechas esperadas se consideran en el arrendamiento de un predio rústico como parte integrante de la cosa arrendada, y cada cosecha, antes de ser percibida, forma un solo todo con el predio, tanto si se atiende al contrato, como a la realidad de las cosas."

La intención de la cláusula quinta de la escritura es clara. Su obvio propósito fue el de evitar los inconvenientes por razón de la cosecha de la última anualidad obligándose Aramburu a entregar a medida que fuera cortando advertido que una vez llegado el 1ro. de julio de 1965 quedarían a beneficio de la finca todas las mejoras, incluyendo los retoños y otras plantaciones, sin derecho a ser indemnizado. Al pactarse un término al subarrendamiento fue la voluntad de las partes no tener que acudir a la solución supletoria que ofrece el Art. 1467 del Código Civil (31 L.P.R.A. sec. 4083):

"El arrendamiento de un predio rústico, cuando no se fija su duración, se entiende hecho por todo el tiempo necesario para la

---

[2] Artículos 1575 y 1576 del Código Civil Español equivalentes al 1465 y 1466 del nuestro. (31 L.P.R.A. secs. 4081–4082.)

recolección de los frutos que toda la finca arrendada diere en un año o pueda dar por una vez aunque pasen dos o más años para obtenerlos.

El de tierras labrantías, divididas en dos o más hojas, se entiende por tantos años cuantas sean éstas."

La cláusula quinta de la escritura contempló, además, evitar la posibilidad de controversias entre las partes respecto al pago o indemnización por concepto de siembras o retoños que Aramburu hubiese sembrado y no cortado, independiente de su buena o mala fe, y, a la vez, reglamentar los derechos y obligaciones de la Asociación y de Aramburu, como subarrendadora entrante y subarrendatario saliente respectivamente, durante la última anualidad prescindiendo así de las disposiciones del Art. 1468 del Código Civil (31 L.P.R.A. sec. 4084) que dispone:

"El arrendatario saliente debe permitir al entrante el uso del local y demás medios necesarios para las labores preparatorias del año siguiente; y recíprocamente, el entrante tiene obligación de permitir al colono saliente lo necesario para la recolección y aprovechamiento de los frutos, todo con arreglo a la costumbre de pueblo."

Nada encontramos en la cláusula quinta que sea contraria a la ley, a la moral ni al orden público. *Juncos Central Co.* v. *Del Toro*, 41 D.P.R. 183 (1930); *Bravo* v. *Hau*, 59 D.P.R. 696 (1942). Tampoco median aquí razones que justifiquen la aplicación de la doctrina de enriquecimiento injusto. *Compañía Popular* v. *Corte*, 63 D.P.R. 121 (1944); *Silva* v. *Comisión Industrial*, 91 D.P.R. 891 (1965); *San Miguel Fertil. Corp.* v. *P.R. Drydock*, 94 D.P.R. 424 (1967). El enriquecimiento, si alguno tuvo la Asociación en sus relaciones con Aramburu, no carecía de causa, considerando que era obligación de Aramburu entregar las cañas a la Asociación al ritmo de la molienda para coincidir el inicio del corte con el inicio de la zafra y la terminación del corte con la terminación de la zafra, y que todas las cañas fueran

total y exclusivamente molidas en la Central Lafayette. No encontramos razón alguna que pueda dar lugar en este caso a una reducción en la renta o en el pago de las contribuciones territoriales.

*Por lo anteriormente expresado se confirmará la sentencia objeto del presente recurso.*

El Juez Presidente Señor Negrón Fernández, y el Juez Asociado Señor Pérez Pimentel no intervinieron.