Estado Libre Asociado de Puerto Rico
**TRIBUNAL DE APELACIONES**
**PANEL ESPECIAL**

| Tropical Fruit, S.E.<br><br>Apelado<br><br>vs.<br><br>Torres & Torres Certified Public Accountants & Business Consultants, P.S.C.; Roberto Torres Torres y Wanda Quiñones Nieves<br><br>Apelantes | TA2025AP00084<br><br>cons. con<br><br>TA2025CE00290[1] | **APELACIÓN** procedente del Tribunal de Primera Instancia, Sala Superior de Ponce<br><br>Civil Núm.: J AC2012-0572<br><br>Sobre: Incumplimiento de Contrato, Mala Fe Contractual, Cobro de lo Indebido |

Panel integrado por su presidente, el Juez Rivera Colón, la Juez Lebrón Nieves y el Juez Rodríguez Flores.

Rivera Colón, Juez Ponente

### SENTENCIA

En San Juan, Puerto Rico, a 31 de octubre de 2025

Comparecen Torres & Torres Certified Public Accountants & Business Consultants, PSC y el Sr. Roberto Torres Torres (conjuntamente, parte apelante), a los fines de solicitar la revocación de la Sentencia emitida el 30 de mayo de 2025[2], y la revisión de la Resolución dictada el 25 de junio de igual año[3], por el Tribunal de Primera Instancia, Sala Superior de Ponce (TPI o foro primario). Mediante el primer dictamen, el foro primario declaró Con Lugar la Demanda sobre cobro de lo indebido, instada por Tropical Fruit, S.E. (Tropical Fruit o parte apelada). En el segundo, declaró Ha Lugar el Memorando de Costas presentado por la parte apelada.

---

[1] El 27 de agosto de 2025, este Tribunal emitió una Resolución en la cual ordenamos la consolidación del escrito de apelación con la petición de Certiorari de conformidad con la Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1.
[2] Notificada el 5 de junio de 2025.
[3] Notificada el 15 de julio de 2025.

Examinada la totalidad del expediente, a la luz del derecho vigente, confirmamos la Sentencia apelada. No obstante, modificamos la Resolución recurrida, y así modificada, confirmamos, por los fundamentos que expondremos a continuación.

**I.**

El 17 de octubre de 2012, Tropical Fruit instó una Demanda de cobro de lo indebido en contra de Torres & Torres y su presidente, el Sr. Torres Torres. En síntesis, alegó que, durante el periodo del 2010 al 2011, el Sr. Torres Torres, contable de la compañía apelada, sobrefacturó la cantidad de $124,321.00, en incumplimiento contractual.

En vista de ello, el 6 de diciembre de 2012, la parte apelante presentó su Contestación a la Demanda[4], en la cual negó la mayoría de las alegaciones levantadas en su contra. En esencia, arguyó que, la parte apelada emitió todos los pagos fundamentados en justa causa.

Luego de múltiples acontecimientos procesales[5], el foro primario celebró el juicio. Evaluada la prueba testimonial, pericial y documental desfilada en dicho proceso, el 30 de mayo de 2025, el TPI emitió la Sentencia, notificada el 5 de junio de 2025, en la cual declaró Con Lugar la Demanda instada en cobro de lo indebido. En lo pertinente, formuló las siguientes determinaciones de hechos:

> *1. Tropical Fruit, S.E., es una sociedad especial organizada de conformidad con las Leyes del Estado Libre Asociado de Puerto Rico.*

---

[4] El 16 de mayo de 2013, Tropical Fruit radicó una Demanda Enmendada, a los únicos efectos de incluir a Universal Insurance Company como parte demandada.

[5] El 29 de diciembre de 2020, el Sr. Torres Torres presentó una Moción de Sentencia Sumaria a los fines de que se desestimara la reclamación instada en su contra. Señaló que, no se constituyeron los elementos de la doctrina de cobro de lo indebido, y agregó que no procede el descorrimiento del velo corporativo. Presentada la oposición de Tropical Fruits, el 7 de octubre de 2021, el TPI emitió una Resolución en la que declaró No Ha Lugar la petición de sentencia sumaria. En esencia, formuló una serie de determinaciones de hechos controvertidos e incontrovertidos. Estos últimos hechos quedaron recogidos en la Sentencia apelada.

*2. Torres & Torres Certified Public Accounts and Business Consultants, P.S.C., es una entidad organizada de conformidad con las Leyes del Estado Libre Asociado de Puerto Rico.*

*3. El Sr. Torres es presidente y, consecuentemente, empleado de Torres & Torres Certified Public Accountants and Business Consultants.*

*4. El Sr. Torres, en representación de Torres & Torres Certified Public Accountants and Business Consultants, C.S.P. suscribió un acuerdo con Tropical Fruit, S.E., el 8 de enero de 2008 para ofrecer servicios de contabilidad y contributivos a dicha sociedad especial.*

*5. Toda la facturación realizada a Tropical Fruits, S.E. en relación a los servicios pactados fue realizada por Torres & Torres. De igual modo, todos los pagos emitidos por Tropical Fruit, S.E. en relación a los servicios contratados con Torres & Torres fueron realizados a Torres & Torres CPA, PSC.*

*6. El 10 de enero de 2008, Tropical Fruit, SE por conducto de su socio administrador Avshalom Lubin contrató los servicios de Torres & Torres Certified Public Accountants & Business Consultants, P.S.C. ("Torres & Torres) presidida por el codemandado Roberto Torres Torres (en adelante Torres). Entre otras tareas, Torres & Torres estaba encargada de llevar, mantener y manejar los libros y récords de contabilidad de Tropical Fruit. Con el pasar de los meses, Tropical Fruit contrató a Torres & Torres para la prestación de otros servicios. Según los términos y condiciones pactados, los servicios de contabilidad serían pagados a base de una tarifa fija mensual (iguala) de $1,500.00 mensuales para un total de $18,000.00 anuales.*[...]

*7. El contrato entre Torres & Torres no provee para el pago de servicios profesionales a una tarifa por hora. Según el contrato, la única excepción es "si se nos requiere hacer gestiones en las agencias pertinentes estas se cobrarán por separado a nuestras tarifas por hora".*

*8. El contrato de servicios profesionales no identificó las tarifas por hora a las que tendría derecho Torres & Torres "si se nos requiere hacer gestiones en las agencias pertinentes".*

*9. Torres & Torres no notificó por escrito las tarifas por horas a Tropical Fruit.*

*10. El contrato de servicios fue redactado por el Sr. Torres. Del testimonio del Sr. Torres se desprende, además, que era quien estuvo activo en conversaciones con Tropical Fruit.*

*11. El contrato de servicios firmado el 10 de enero de 2008 es el único contrato para proveer servicios profesionales de contabilidad suscrito entre Tropical Fruit & [sic] Torres & Torres. Eso abarca los servicios allí descritos y los de teneduría de libros ("bookkeeping"). Los otros dos [sic] contratos suscritos entre Tropical Fruit y Torres & Torres atendían otras tareas y servicios.*

12. Las facturas de Torres y Torres no desglosan las horas trabajadas por el "staff", ni por el propio Sr. Torres.

13. El Sr. Torres es el único accionista de Torres & Torres.

14. Los servicios de Torres & Torres se prestaban físicamente en la oficina de Tropical Fruit porque allí estaba la computadora donde se mantenía el sistema computarizado de contabilidad. Tropical Fruit le dio al Sr. Roberto Torres y a Torres & Torres acceso a la computadora de Tropical Fruit donde se mantenía el sistema computarizado de contabilidad.

15. El acceso a la información almacenada en la computadora y al sistema computarizado de contabilidad estaba controlado con una clave de acceso o contraseña de la cual el Sr. Roberto Torres y Torres & Torres tenían conocimiento.

16. El Sr. Torres era el que preparaba las facturas de Torres & Torres.

17. En adición al contrato de servicios profesionales del 10 de enero de 2008, Torres & Torres presentó otras tres propuestas de servicios que fueron aceptadas por Tropical Fruit:

a. Propuesta de 30 de junio de 2008 para "Creation of New Employees Functions and Tasks" por la cantidad de $35,500.00.

b. Propuesta de 10 de julio de 2009 para la compilación de proyecciones por la cantidad de $l,500/$2,500.

c. Propuesta de 15 de septiembre de 2011 para la compilación de proyecciones por la cantidad de $l,800/$4,000.

18. Durante el período de cuatro años de 2008 al 2011, la cantidad máxima que debió facturar Torres & Torres conforme el contrato y las propuestas definidas:

| | |
|---|---|
| a. Servicios de Contabilidad (4 años x $18,000.00) | $ 72,000.00 |
| b. Creation of New Employees Functions and Tasks | $ 35,500.00 |
| c. Compilación de proyecciones | $ 2,500.00 |
| d. Compilación de proyecciones | $ 4,000.00 |
| Total: | $114,000.00 |

19. Durante el período de cuatro años de 2008 al 2011, Torres & Torres facturó $432,183.00.

20. La diferencia en la facturación contratada y la facturación finalmente presentada por Torres & Torres es de $318,183.00 ($432,183.00- $114,000.00).

21. De la totalidad de los $318,183.00 facturados por Torres & Torres, cobró $305,286.00.

22. De esta suma, $225,000.00 se deben deducir porque Tropical Fruits aceptó que son objeto de un pleito en otro caso.

23. Conforme testificó el Sr. Torres en su deposición, las facturas deben contener los documentos de apoyo

("support") que demuestran en los servicios prestados y la persona que los prestó.

24. Las facturas de Torres & Torres obrantes en los autos, no incluyen los documentos de apoyo ("support") que puedan demostrar el detalle de los servicios prestados y la persona que los prestó.

25. El Sr. Torres testificó que las facturas de Torres & Torres las aprobaba en un momento dado Verónica Caraballo, empleada de Tropical Fruit, junto con la gerencia, quien renunció para irse a trabajar con Torres & Torres. Luego de eso, quien las aprobaba era el Sr. Lubin.

26. Sobre el reconocimiento contable del cheque de Avshalom Lubin por la suma de $225,000.00 a favor de Torres & Torres, el Sr. Torres ofreció cuatro explicaciones diferentes, todas inconsistentes entre (i) que el pago era una indemnización por daños sufridos; (ii) que el pago era por concepto de consultoría financiera; (iii) que el pago era un reembolso por gastos incurridos en gestiones de venta de terrenos de Tropical Fruit; (iv) que el pago era por servicios profesionales.

**A continuación, se formulan las determinaciones de hechos probados durante el juicio en su fondo sobre las controversias que quedaban pendientes según la Resolución del 7 de octubre de 2021:**

27. El Sr. Jacob Lubin es CEO de Tropical Fruit desde el 2012. Según los récords de dicha entidad, los únicos acuerdos escritos con Torres & Torres son aquellos admitidos como los Exhibit I, II, III y IV Estipulado. [5:37-7:11 de 21 de abril de 2025].

28. El CPA Emmanuelli fue contratado a principios del año 2012 por Tropical Fruit para prestar servicios de contabilidad, preparar los estados financieros, auditar los estados financieros, preparar las planillas de contribución sobre ingresos de Tropical Fruit y en ocasiones lo contrataban para hacer proyecciones de cash. [33:18-36:00 de 11 de julio de 2024].

29. El CPA Emmanuelli fue contratado luego de que Torres & Torres terminara su contrato con Tropical Fruit. [39:07 de 11 de julio de 2024].

30. El CPA Emmanuelli declaró que la contabilidad de Tropical Fruit al 31 de octubre de 2011, la hizo el Sr. Torres y Torres & Torres. [41:38 de 11 de julio de 2024].

31. Como parte del proceso de auditoría para el año fiscal que terminaba en 31 de octubre de 2011, el CPA Emmanuelli analizó las cuentas a cobrar, cuentas a pagar, ingresos, gastos y determinar cuáles cuentas eran materiales. [40:50-42:54 de 11 de julio de 2024].

32. El CPA Emmanuelli también analizó los gastos por concepto de servicios profesionales y se percató de un aumento sustancial en comparación con años anteriores, al igual que en las cuentas a pagar. [42:55-43:20 de 11 de julio de 2024].

33. Como parte del proceso de corroboración de cuentas a pagar, el CPA Emmanuelli hizo una selección a base de materialidad y les solicitó a los acreedores de

*Tropical Fruit que corroboraban los balances. Torres & Torres era uno de esos acreedores, a quien le solicitó la confirmación de los balances adeudados por Tropical Fruit. En respuesta a la solicitud de confirmación, les confirmó el balance con un estado de cuenta de Torres & Torres. [43:40-45:22 de 11 de julio de 2024].*

*34. El CPA Emmanuelli le suministró al CPA Quiñones todos los documentos que éste le solicitó, entre los que se encuentran los récords de contabilidad de Tropical Fruit, un mayor general (general ledger) del 2011, los estados financieros de Tropical Fruit, las facturas emitidas por Torres & Torres, cheques emitidos por Tropical Fruit a Torres & Torres, el estado de cuenta sometido por Torres & Torres. [55:134:00:08 de 11 de julio de 2024].*

*35. Según surge de su Informe Pericial y de su testimonio, el CPA Quiñones, además de ser contador público autorizado, cuenta con las siguientes licencias o certificaciones profesionales: (i) Certified Fraud Examiner - Investigador de Fraude Certificado; (ii) Certified Forensic Accountant - Contador Forense Certificado. [7:05 de 9 de julio de 2024]. La certificación como contador forense, lo cualifica para hacer investigaciones relacionadas en asuntos económicos donde hay transacciones comerciales y transacciones de índole económica "y el contador forense tiene el entrenamiento, la capacidad y la experiencia para hacer investigaciones y llegar a conclusiones". [8:40-9:24 de 9 de julio de 2024]. La certificación como investigador de fraude se especializa en la identificación de la existencia de fraude y su cuantificación. [10:00 de 9 de julio de 2024].*

*36. El CPA Quiñones declaró que una iguala es un contrato mediante el cual se cobra una cantidad fija mensual para brindar cierto tipo de servicios. En un contrato de servicios por hora el tiempo que se dedica al trabajo se factura a base de una tarifa predeterminada por hora. [30:03-30:54 de 9 de julio de 20241.*

*37. Según el testimonio del CPA Quiñones, las facturas de Torres & Torres son parcas, no proveen información suficiente ni adecuada para determinar cuáles fueron los servicios rendidos, quien los rindió, ni las horas dedicadas el servicio. [32:59 de 9 de julio de 2024].*

*38. Según se desprende de la página 8 del Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) durante el periodo comprendido del año 2008 al 2011, Torres & Torres sobrefacturó la suma de $318,183.00[...] de los cuales cobró $305,286.00[...]. Descontada una partida de $225,000.00 porque está siendo cobrada en otro caso relacionado[...], Torres & Torres cobró la suma de $80,286.00 en exceso.*

*39. En torno a la suma de $80,286.00 facturados por Torres & Torres en exceso, el CPA Quiñones declaró que no existía justificación alguna. En torno a la justificación provista por Torres & Torres de que el exceso se debió a que realizaron más trabajo cuando una empleada de Tropical Fruit que hacía trabajos de contabilidad (Verónica Caraballo) renunció, declaró que no existe*

*acuerdo escrito alguno que así lo establezca a pesar de que Torres & Torres hacía contratos por cantidades pequeñas, tales como para la compilación de estados financieros (Exhibit III Estipulado) y preparación de proyecciones (Exhibit II Estipulado), pero para dicho alegado cambio que conllevaba unos pagos significativos no requirió ningún acuerdo escrito. [37:36-39:12 de 9 de julio de 2024].*

40. *El CPA Quiñones, examinó cierta factura de $225,000 de Torres & Torres a Tropical Fruit, el cheque emitido, las entradas de jornal que se hicieron para registrar dicha factura, comunicaciones del Sr. Torres y cierta correspondencia entre el Sr. Torres y el CPA Emmanuelli, entre otros. [47:11-48:01 de 9 de julio de 2024]. Dicha factura fue identificada como la factura 2004-4290 por la suma de $225,000 según aparece en la última página del Anejo 2 de su Informe Pericial (Exhibit 1 de la parte demandante). Tiene conocimiento de que dicha factura existe porque la vio y porque el Sr. Torres hizo referencia a ella en varias comunicaciones. [48:33 de 9 de julio de 2024].*

41. *Según su Informe Pericial (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, el CPA Quiñones evaluó la transacción de $225,000.00 que aparecía en los libros de contabilidad de Tropical Fruit y concluyó que Avshalom Lubin emitió un cheque de $225,000.00 con relación a cierta propuesta de Tropical Solar Farm, un proyecto separado e independiente de las operaciones agrícolas de Tropical Fruit. Dicho cheque fue entregado al Sr. Torres y depositado en la cuenta bancaria de Torres & Torres de Banco Popular. Previo a dicho cheque, es decir, el 22 de octubre de 2011 se habían hecho entradas de jornal en los libros de Tropical Fruit en la que se reconoció un gasto por servicios profesionales por dicha suma y se reconoció una cuenta a pagar por dicha suma (en adelante, "Primera Entrada de Jornal"). En otras palabras, se reconoció una factura de Torres & Torres por servicios profesionales por la suma de $225,000.00. [1:18:56-1:21:44 de 9 de julio de 2024].*

42. *Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio en corte, posteriormente, es decir, el 15 de noviembre de 2011 se hizo una entrada de jornal donde se reconoce un depósito en la cuenta de "Petty cash" de Tropical Fruit y se reconoce una cuenta a pagar a Avshalom Lubin por la suma de $225,000.00. (en adelante, "Segunda Entrada de Jornal"). [1:21:47-1:22:09 de 9 de julio de 2024].*

43. *Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio, posteriormente, es decir, el 15 de noviembre de 2011 se hizo una entrada de jornal donde se reconoce se elimina la cuenta a pagar a Torres & Torres por la suma de $225,000.00 y se elimina el depósito en la cuenta de "petty cash" de Tropical Fruit por dicha misma suma. (en adelante, "Tercera Entrada de Jornal"). Es decir, es como si se hubiera utilizado la cuenta de "petty cash" para pagarle a Torres & Torres la suma de $225,000.00*

*[1:22:13-1:22:36 de 9 de julio de 2024]. Esta tercera entrada se registró también el 15 de noviembre de 2011. [2:00:00 de 9 de julio de 2024].*

*44. Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, las entradas de jornal en los libros de Tropical Fruit demuestran que "se estaban manipulando los récords de contabilidad" por el modo en que se registraron. [1:57:11-1:58:12 de 9 de julio de 2024].*

*45. Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, el resumen de dichas entradas es que el cheque de $225,000.00 emitido por el Sr. Avshalom Lubin fue registrado como un depósito al "petty cash" de Tropical Fruit, a pesar de haber sido depositado por Torres & Torres en su cuenta bancaria. [2:00:40-2:00:01 de 9 de julio de 2024].*

*46. Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, la transacción relacionada a los $225,000.00 es una personal del Sr. Avshalom Lubin con el Sr. Torres y/o Tropical Solar Farm, LLC que terminó con una factura de Torres & Torres por dicha suma. [2:01:57-2:03:20 de 9 de julio de 2024]*

*47. Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, [t]anto el Sr. Torres y/o Torres & Torres dieron versiones diferentes en torno a dicha transacción de $225,000.00. [2:03:21-2:04:41 de 9 de julio de 2024].*

*48. Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, dicha transacción de $225,000.00 está relacionada a cierta controversia entre el Sr. Avshalom Lubin con Tropical Solar Farm, LLC y/o el Sr. Torres sobre cierto proyecto de energía solar. En particular, con ciertos gastos y daños que Tropical Solar Farm, LLC y/o el Sr. Torres estaban reclamando sobre cierto "PPA" y la venta de un terreno. [2:05:05-2:08:57 de 9 de julio de 2024].*

*49. Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, los daños que estaban reclamando Tropical Solar Farm, LLC y/o el Sr. Torres fueron alegadamente satisfechos mediante el pago de $225,000.00 hecho por el Sr. Avshalom Lubin, para lo cual Torres & Torres generó la factura 2004-4290 por la suma de $225,000.00 que nada tenía que ver con los servicios prestados por dicha entidad y el CPA Torres hizo entradas de jornal en los libros de Tropical Fruit sobre dicha transacción. [2:10:21-2:16:03 de 9 de julio de 2024]. En otras palabras, el Sr. Torres usó la personalidad jurídica de Torres & Torres para generar la factura 2004-4290 por la suma de $225,000.00 a pesar de que se trataba de una transacción personal del Sr. Torres y/o de Tropical Solar Farm, LLC y que nada tenía que ver con servicios prestados por dicha entidad por Torres & Torres.*

50. *Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, el cheque de $225,000.00 del Sr. Avshalom Lubin girado a favor de Torres & Torres fue por gastos incurridos por el CPA Torres y/o Tropical Solar Farm, LLC en la venta de un terreno. [2:19:16-2:21:24 de 9 de julio de 2024].*

51. *Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en corte, al llevar a cabo su análisis observó las normas profesionales que aplican a los contadores públicos autorizados, las normas que aplican a los investigadores de fraude, las normas sobre investigación forense y otras según aparecen identificadas en la página 29 de dicho documento. [2:27:16-2:29:35 de 9 de julio de 2024].*

52. *Según el Informe Pericial del CPA Quiñones (Exhibit 1 de la parte demandante) y su testimonio vertido en sala, la existencia de la factura 2004-4290 de Torres y Torres por $225,000.00 (cuyo origen se remonta a cierta disputa entre el Sr. Torres, Tropical Solar Farm LLC y el Sr. Avshalom Lubin) quedó demostrada por los siguientes documentos:*

a. *Entrada de contabilidad a la cuenta 55500 - Professional Service Expense por dicha suma;*

b. *Estado de cuenta de Torres & Torres recibido por el auditor CPA Rafael Emmanuelli que refleja dicha factura;*

c. *Carta de 8 de noviembre de 2011 suscrita por Roberto Torres donde admite que Torres & Torres generó la factura 2004-4290 por $225,000.00 por servicios de consultoría, según surge del Anejo 8.*

d. *Carta del 23 de noviembre de 2011 suscrita por Roberto Torres donde admite que Torres & Torres generó la factura 2004-4290 por $225,000.00 por servicios profesionales, según surge del Anejo 14.*

53. *Los hechos relatados por el CPA Quiñones, junto a sus opiniones, demuestran que el Sr. Torres mantenía de forma separada sus asuntos personales de los Torres & Torres, y que Torres & Torres es un alter ego del Sr. Torres.*

54. *La Sra. Betzaida Ramírez comenzó a trabajar en Torres & Torres en febrero de 2010 en el puesto de secretaria. Como parte de sus funciones, hacía llamadas y "data entry" de contabilidad, nómina y planillas. [46:56-47:26 de 21 de abril de 2025]. En relación a Tropical Fruit, hacía gestiones de "data entry" de facturas, de nóminas, de las cuentas por pagar, de las cuentas por cobrar y a la pregunta de si hacía alguna otra gestión, declaró "no que recuerde así ahora mismo". [47:44-48:12 de 21 de abril de 2025]. Aunque declaró que le llevaba a Tropical Fruit las facturas de Torres & Torres y que recogía los cheques con los que Tropical Fruits pagaba los servicios de Torres & Torres, dicha parte de su testimonio no nos mereció credibilidad porque fue el resultado de una pregunta sugestiva. [48:15-48:42 de 21 de abril de 2025].*

55. No se presentó prueba documental o testifical que demuestre que la Sra. Ramírez tenía conocimiento de los términos y condiciones contenidos en los diversos contratos de servicios suscritos entre Tropical Fruit y Torres & Torres, ni del contenido de las facturas de Torres & Torres a Tropical Fruit, ni de los conceptos por los cuales Tropical Fruit emitía sus pagos.

56. Preguntado que describiera la relación profesional entre Torres & Torres y Tropical Fruit, el CPA Luciano declaró que Tropical Fruits y Torres & Torres suscribían cartas compromisos para los servicios contratados entre sí. [24:19-25:34 de 22 de abril de 2025].

57. En relación a la carta contrato de 8 de enero de 2008 (Exhibit I Estipulado), el CPA Luciano declaró que en la Sección III titulada Honorarios no establece que cualquier exceso de las 32 horas de servicio serían satisfechos a una tarifa por hora. [1 :10:08-1 :12:36 de 22 de abril de 2025]. En cuanto a la Sección 1(D) de dicho documento, el CPA Luciano declaró que allí se establece que la prestación de servicios a agencias gubernamentales sería satisfecha a base de una tarifa por hora, que esa es la única instancia en que se facturaría por hora y tampoco indica cuanto sería la tarifa por hora. [1:14:48-1:16:02 de 22 de abril de 2025].

58. El CPA Luciano declaró que en adición a la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado), se suscribieron otros tres acuerdos por escrito para prestar otros servicios. [1:31:1-1:31:40 de 22 de abril de 2025]. Reconoció además que no hubo ningún acuerdo por escrito que documentara las tareas adicionales que realizaría Torres & Torres como resultado de la renuncia de Verónica Caraballo. [1:32:00 de 22 de abril de 2025].

59. A pesar de que en la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) dispone que la facturación por los servicios de contabilidad allí contratados sería a razón de $1,500.00 mensuales, declaró que la concesión de créditos por parte de Torres & Torres a Tropical Fruit demostraba que la facturación contratada "aparentaba ser por hora porque se daban créditos". [1:59:53 de 22 de abril de 2025]. Más adelante, afirmó que "es un acuerdo por hora [...] porque los documentos dicen que se está facturando por hora". [2:01:43 - 2:02:00 de 22 de abril de 2025]. Dicho testimonio no nos mereció credibilidad. Un examen de dicho documento revela que no le concedió a Torres & Torres la facultad de alterar de forma unilateral lo expresamente pactado en torno a que los servicios de contabilidad allí contratados serían a razón de $1,500.00 mensuales y no se presentó evidencia de que dicho acuerdo haya sido modificado de forma escrita. Además, la aseveración del CPA Luciano no es convincente por el propio texto del documento que dispone que "solamente incluyo los servicios de contabilidad añadiendo las horas necesarias para realizar las tareas solicitadas internamente en sus oficinas" (Énfasis en el original). Sobre dicho texto citado, el CPA Luciano admitió que esas "horas

*necesarias" eran las 32 horas contempladas en dicho documento, las cuales eran suficientes para cumplir el contrato [2:07:32 - 2:07:53 de 22 de abril de 2025]. Además, un examen de la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) revela que nada dispone en torno a la concesión de créditos a Tropical Fruit en la eventualidad de que los servicios prestados por Torres & Torres no alcanzara las 32 horas mensuales. Así pues, cualquier crédito concedido a Tropical Fruit fue un acto libre y voluntario de Torres & Torres y no el resultado de una obligación contractual.*

*60. En su Informe Pericial (Exhibit 7 de la parte demandada), el CPA Luciano concluyó que la facturación por hora fue aceptada porque "Tropical Fruit nunca cuestionó a Torres & Torres". Sin embargo, no existe nada en la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) que establezca un plazo de tiempo para que Tropical Fruit presentara objeciones a las facturas por los servicios allí contratados y que de no cumplir con dicho plazo, quedaba renunciada cualquier objeción.*

*61. El Informe Pericial del CPA Luciano (Exhibit 7 de la parte demandada) no hace referencia a la existencia de documento alguno que tuviera el efecto de enmendar y/o suplementar los términos y condiciones del contrato del 8 de enero de 2008, ni de documento alguno que estableciera las tarifas por hora que cobraría Torres & Torres en relación a la prestación de servicios ante agencias gubernamentales. Tampoco lo hizo durante su testimonio.*

*62. En su Informe Pericial (Exhibit 7 de la parte demandada), el CPA Luciano concluyó que el aumento en facturación de Torres & Torres se debió a que éste último asumió tareas adicionales como resultado de la renuncia de Verónica Caraballo a Tropical Fruit, quien ejercía funciones de contable a tiempo completo.*

*63. El Sr. Torres maneja a Torres & Torres y ocupa el puesto de presidente. [2:40:42, 2:41:15 de 22 de abril de 2025]. También es su único accionista. [2:40:42, 2:41 :15 de 22 de abril de 2025. [2:53:15 de 22 de abril de 2025].*

*64. Según admitiera el Sr. Torres, las facturas de Torres & Torres son redactadas por él. [16:00 de 23 de abril de 2025.*

*65. En torno a la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado), el Sr. Torres declaró que las tarifas por hora están contenidas en el "cover letter" o carta de trámite de dicho documento (Exhibit 11 de la parte demandada). [3:22:45 de 22 de abril de 2025]. Aunque dicho "cover letter" fue debidamente autenticado, su contenido no es consistente con la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) y habiendo examinado la totalidad de la prueba, no nos merece credibilidad.*[...] *Primero, el Exhibit IV Estipulado tiene en la parte superior datos que indican fue tramitado vía facsímil, mientras que el "cover letter" no tiene esos datos. Segundo, la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) en su primera*

*oración indica "le someto un acuerdo preliminar de servicios de contabilidad", mientras que el "cover letter" indica "procedimos a enmendar nuestra propuesta de servicios". Tercero, no resulta creíble que datos tan significativos como la tarifa por hora contemplada la Sección D de la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) para aquellas "gestiones en las agencias pertinentes" realizadas por Torres & Torres no hayan sido incorporadas al acuerdo, ni se haya hecho referencia al documento donde estaban alegadamente contenidas. Hay que destacar que el acuerdo del 30 de junio de 2008 (Exhibit I Estipulado) contiene las tarifas por hora contempladas. Cuarto, el Exhibit IV Estipulado no tiene lenguaje alguno que sugiera que las tarifas por hora estaban contenidas en el "cover letter". Quinto, el Exhibit 11 de la parte demandada no contiene la palabra "cover letter" o lenguaje alguno que sugiera que se está incluyendo algún otro documento. Sexto, el testigo Jacob Lubin declaró que los únicos acuerdos que obraban en los récords de Tropical Fruit son los Exhibits Estipulados I, II, III y IV. Sin embargo, durante el contrainterrogatorio no se le preguntó por la existencia en sus récords de documento alguno que complementaba o enmendaba el contenido del Exhibit IV. Séptimo, a nuestro juicio la parte demandada no puede enmendar un documento estipulado por las partes. Al aceptar estipular dicho documento, la parte demandada estaba aceptando que se trataba de un documento que estaba completo y siendo un contrato, estaba aceptando que el negocio jurídico allí contenido estaba completo. Al estipular su autenticidad y contenido, la parte luego no podía alegar que dicho documento estaba incompleto o que no reflejaba la totalidad. Rivera Menéndez y Action Service Corp. 185 D.P.R. 431 (2017). Octavo, mediante este documento la parte demandada pretende enmendar la determinación de hecho número 8 y 9 de la Resolución del 7 de octubre de 2021. Hemos revisado los autos y dicho documento fue incluido en apoyo a la solicitud de sentencia sumaria, a pesar de que incluyó el Exhibit IV Estipulado, ni en la réplica a la oposición a la solicitud de sentencia sumaria, ni en la solicitud de reconsideración, a pesar de que la parte demandada es el autor. Por tanto, el contenido de dicho documento carece de valor probatorio y contraviene la doctrina de la ley del caso. Noveno, el CPA Luciano no hizo referencia a este documento durante su testimonio, ni en su Informe Pericial (Exhibit 7 de la parte demandada) a pesar de que dicho documento tiene una fecha previa. Tampoco se justificó dicha omisión. Siendo el perito de la parte demandada, es razonable concluir que su cliente le suministró todos los documentos importantes para su defensa para que pudiera llevar a cabo su análisis.*

*66. El Sr. Torres admitió que la carta contrato de 8 de enero de 2008 (Exhibit IV Estipulado) no hace referencia a la concesión de créditos si los servicios prestados no alcanzaban las 32 horas al mes. [1:25:09 de 24 de abril de 2025].*

*67. El Sr. Torres admitió que los "rates" por hora son parte importante de un acuerdo. A pesar de eso, admitió que lo dejó fuera de la propuesta. [1:45:16-1:45:54 de 24 de abril de 2025].* (Notas al calce omitidas y énfasis nuestro).

A la luz de lo anterior, el TPI le ordenó a la parte apelante que emitiera a favor de Tropical Fruit la cantidad de $80,286.00 en concepto de cobro de lo indebido. Dispuso, a su vez, que procede el descorrimiento del velo corporativo contra el Sr. Torres Torres por emplear su corporación en beneficio propio. Por último, requirió que la parte apelada presentara un memorando de costas.

En cumplimiento, el 13 de junio de 2025, Tropical Fruit sometió su Memorando de Costas, mediante el que solicitó la cantidad de $65,258.60, según se desglosa a continuación:

| Concepto | Cantidad |
|---|---|
| Honorario de perito CPA Reynaldo Quiñones Márquez | $ 61, 462.97 |
| Copiadora Doubledey, Inc. | $ 400.33 |
| Deposición del perito CPA Roberto Luciano | $ 213.20 |
| Deposición del codemandado Roberto Torres Torres | $ 1,085.50 |
| Fotocopias internas | $ 377.00 |
| Servicios de mensajería, radicación y emplazamiento | $ 1,396.00 |
| Sellos y comprobantes | $ 323.60 |
| Gran total | $ 65,258.60 |

En desacuerdo, el 23 de junio de 2025, la parte apelante presentó su Oposición a Memorando de Costas. En esencia, argumentó que, la parte apelada no colocó al TPI en posición de conceder las cuantías desglosadas. Particularmente, adujo que, dicha parte no demostró la razonabilidad y la necesidad de las costas reclamadas.

Evaluadas sus posturas, el 25 de junio de 2025, el foro primario dictó una Resolución[6], en la cual declaró Con Lugar el

---

[6] Notificada el 15 de julio de 2025

Memorando de Costas presentados, según la cuantía total reclamada.

Inconformes, el 6 de julio de 2025[7], Torres & Torres y el Sr. Torres Torres recurrieron ante nos mediante un recurso de Apelación, en el cual esbozaron los siguientes señalamientos de error:

> *A. Errores sobre la Admisibilidad o Apreciación de la Evidencia*
>
> *Primer Error: Erró el TPI al no admitir copia de todas las facturas en controversia, de los memorandos de crédito y de todos los cheques correspondientes que evidencian el pago efectuado.*
>
> *Segundo Error: Erró el TPI al no admitir las evidencias del resumen de horas y tareas de los trabajos realizados por Torres & Torres Tropical Fruit.*
>
> *Tercer Error: Erró el TPI al utilizar en su sentencia el alegado pago de $225,000, el cual nada tiene que ver con la alegada sobrefacturación de los servicios profesionales de Torres & Torres, y el cual se está dilucidando en otro caso, esto a pesar de no permitir a los comparecientes a presentar prueba al efecto, violentándose así su derecho al debido proceso de ley.*
>
> *Cuarto Error: Erró el TPI al no darle credibilidad a la carta de 8 de enero de 2008, Exhibit 11 de los demandados, Apéndice 32, pág. 799, cuando la misma no fue refutada en ningún momento por la parte demandante.*
>
> B. *Errores Aplicables a Torres & Torres*
>
> *Quinto Error: Erró el TPI al emitir la Sentencia ya que no tomó en consideración las determinaciones del propio Tribunal en la Resolución del 7 de octubre de 2021 a los efectos de cuáles eran las controversias prevalecientes entre las partes, sobre las cuales la parte demandante debía presentar evidencia.*
>
> *Sexto Error: Erró el TPI al emitir Sentencia y resolver que aplicaba la figura de pago de lo indebido. No desestimó el caso cuando la parte demandante no presentó las facturas o evidencia de pagos, pieza básica en un caso de cobro de lo indebido.*
>
> C. *Errores Aplicables al Sr. Roberto Torres*
>
> *Séptimo Error: Erró el TPI al descorrer el velo corporativo cuando el demandante apelado no presentó prueba al respecto y en ausencia de los requisitos prevalecientes en nuestro ordenamiento jurídico para justificar el levantar el velo corporativo.*

---

[7] La parte apelante presentó su escrito en exceso de página. Por tanto, el 9 de julio de 2025, esta *Curia* emitió una Resolución a los fines de que sometiera un escrito apelativo ajustado al número de página exigido en la Regla 16(D) del Reglamento del Tribunal de Apelaciones, 2025 TSPR 42, pág. 31, 215 DPR ____ (2025).

*Octavo Error: Erró el TPI al resolver que se incurrió en dolo sin prueba directa ni inferencia razonable sobre el mismo.*

*Noveno Error: Erró el TPI, en su interpretación y aplicación de las disposiciones de la Regla 36 de Procedimiento Civil de Puerto Rico, al incluir en su Resolución (Apéndice 3, pág. 40) del 7 de octubre de 2021 unas determinaciones de hechos no apoyadas por la prueba.*

Pendiente de adjudicación el recurso apelativo, el 13 de agosto de 2025, la parte apelante presentó una Petición de *Certiorari*. En este recurso, expuso los siguientes señalamientos de error:

*Primer Error: Erró el TPI al notificar la Resolución resolviendo la solicitud de costas luego de la radicación de la Apelación sobre este mismo caso, por lo que dicha Resolución se expidió sin jurisdicción para así hacerlo.*

*Segundo Error: Erró el TPI al conceder la totalidad de las costas solicitadas por la parte demandante-recurrida, a pesar de que:*

*La parte demandante no estableció la razonabilidad y necesidad de las mismas,*

*La parte demandante incluyó partidas sobre las cuales no se pueden conceder costas,*

*La parte demandante incluyó gastos pertenecientes a otros casos no relacionados a este caso,*

*La parte demandante incluyó un total de costas en su moción que excede las facturas totales sometidas induciendo a error al TPI, y*

*La parte demandante no presentó prueba que justifique los honorarios de su perito.*

Examinados ambos recursos, el 27 de agosto de 2025, este Tribunal emitió una Resolución para ordenar la consolidación de estos, de conformidad con la Regla 44.1 de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1. Tras una serie de acontecimientos procesales, el 5 de septiembre de 2025, este foro intermedio apelativo emitió una Resolución, en la cual decretamos que la parte apelante presentara la Transcripción Estipulada de la Prueba dentro del término a vencer el 11 de septiembre de 2025. Así las cosas, el 10 de septiembre de 2025, Torres & Torres y el Sr. Torres Torres presentaron una Moción Informativa Sometiendo Transcripción Estipulada de la Prueba Oral.

Eventualmente, por orden de este Tribunal, la parte apelante radicó un escrito intitulado Alegato Suplementario de los Apelantes bajo la Regla 21 del Reglamento del Tribunal De Apelaciones. Así las cosas, mediante la Resolución dictada el 1 de octubre de 2025, le concedimos a Tropical Fruit hasta el 20 de octubre de 2025 para presentar su alegato en oposición. En cumplimiento, Tropical Fruit sometió su Alegato Consolidado en Oposición a Recurso de Apelación y Petición de *Certiorari*.

Con el beneficio de la comparecencia de las partes, procedemos a discutir el marco legal pertinente a la controversia ante nuestra consideración.

**II.**

**A.**

El Art. 1206 del Código Civil (1930),[8] Ley Núm. 48 de 28 de abril de 1930, 31 LPRA sec. 3337, según enmendado (Código Civil o Ley Núm. 48), preceptúa que el contrato existe desde que una o varias personas consienten en obligarse respecto de otra u otras, a dar alguna cosa, o prestar algún servicio. Así que, "[l]as obligaciones que nacen de los contratos tienen fuerza de ley entre las partes contratantes, y deben cumplirse al tenor de los mismos", según dispone el Art. 1044 de la Ley Núm. 48, *supra*, 31 LPRA sec. 2994.

Ahora bien, las obligaciones de naturaleza contractual advienen a la vida jurídica cuando concurren los siguientes requisitos: (1) el consentimiento de los contratantes, (2) el objeto cierto en la materia del contrato, y (3) la causa de la obligación que se establezca. Art. 1213 del Código Civil, *supra*, 31 LPRA sec. 3391. Cónsono con lo anterior, el Art. 1210 del Código Civil,

---

[8] Los hechos que nos ocupan surgieron bajo el Código Civil (1930), *supra*. Por tal razón, aludimos a las disposiciones de esta la legislación.

*supra*, regula el perfeccionamiento de los contratos, como lee a continuación:

> *Los contratos se perfeccionan por el mero consentimiento, y desde entonces obligan, no sólo al cumplimiento de lo expresamente pactado, sino también a todas las consecuencias que según su naturaleza sean conformes a la **buena fe, al uso y a la ley**.* 31 LPRA sec. 3375. (Énfasis nuestro).

Según la jurisprudencia interpretativa, la buena fe es el deber lealtad exigible entre los contratantes:

> *[L]a lealtad en el tratar, el proceder honrado y leal. Supone el guardar la fidelidad a la palabra dada y no defraudar la confianza, ni abusar de ella; supone un conducirse como cabe esperar de cuantos, con pensamiento honrado, intervienen en el tráfico como contratantes. S.L.G. Ortiz-Alvarado v. Great American*, 182 DPR 48, 67 (2011) (citando a L. Díez-Picazo, La doctrina de los propios actos: un estudio crítico sobre la jurisprudencia del Tribunal Supremo, Barcelona, Eds. Aries, 1963, pág. 157); *VDE Corporation v. F & R Contractors*, 180 DPR 21, 34 (2010); *Colón v. Glamourous Nails,* 167 DPR 33, 45 (2006). (Citas omitidas).

Este principio "impone determinados deberes, en el sentido de estar las partes obligadas a comportarse con la buena fe necesaria y a observar la lealtad exigida por las convicciones éticas imperantes. *Colón v. Glamourous Nails, supra* (citando a J. Puig Brutau, Fundamentos de Derecho Civil, 2da ed., Barcelona, Ed. Bosch, 1978, T. II, Vol. I, pág. 227). Sin embargo, la buena fe puede quebrantarse si surgen vicios en el consentimiento derivados de la actuación dolosa de una parte contratante. Así, pues, el dolo constituye "todo un complejo de malas artes, contrario a las leyes de la honestidad e idóneo para sorprender la buena fe ajena, generalmente en propio beneficio". *S.L.G. Ortiz-Alvarado v. Great American, supra,* a la pág. 63 (2011) (citando a L. Díez-Picazo, Fundamentos del Derecho Civil Patrimonial, 6ta ed., Navarra, Ed. Thomson/Aranzadi, 2007, Vol. I, pág. 170).

De acuerdo con el Máximo Foro estatal, "el elemento objetivo del dolo puede consistir de cualquier conducta como astucias,

argucias, mentiras, sugestiones, y artificios; consisten en la invención de hechos falsos, en la ocultación de los existentes, o en suministrar referencias incompletas de éstos, etc." *S.L.G. Ortiz-Alvarado v. Great American, supra*, a las págs. 64-65 (citando a M. Albaladejo García, Derecho Civil: Introducción y Parte general, 17ma ed., Madrid, Ed. Edifoser, 2006, T. I, pág. 607). Por tales contornos, el dolo "se caracteriza como la infracción voluntaria y consciente de un deber jurídico que ocasiona al otro contratante un perjuicio del que debe responder". Íd. a la pág. 68 (citando a *Márquez v. Torres Campos,* 111 DPR 854, 865 (1982)).

En lo pertinente a este recurso, el Art. 1221 del Código Civil, *supra*, establece que "[h]ay dolo cuando con palabras o maquinaciones insidiosas de parte de uno de los contratantes, es inducido el otro a celebrar un contrato que, sin ellas, no hubiera hecho". 31 LPRA sec. 3408 La Ley Núm. 48, *supra*, distingue esta figura jurídica entre dos tipos de dolo, a saber: (1) el dolo incidental y (2) el dolo grave. Veamos. A tales efectos, el Art. 1222 de la precitada legislación reconoce que el dolo incidental obliga a la parte que lo ocasionó, y le impone el deber de responder por los daños y perjuicios que ocasione. 31 LPRA sec. 3409. Sin embargo, "[n]o produce la anulación del contrato, ya que no tiene una influencia decisiva en la esencia de la obligación, sino que solo facilita la celebración del contrato". *S.L.G. Ortiz-Alvarado v. Great American*, s*upra*, a la pág. 64; *Pérez Rosa v. Morales Rosado*, 172 DPR 216, 230 (2007). Por otro lado, el dolo grave es aquel que produce nulidad de los contratos, pues afecta el consentimiento que inspira y persuade al contratante. *García Reyes v. Cruz Auto Corp.*, 173 DPR 870, 886-887 (2008). No obstante, el Art. 1222 del Código Civil, *supra*, precisa que esta figura opera siempre y cuando el dolo no haya sido empleado por las dos partes contratantes. 31 LPRA sec. 3409.

**B.**

Respecto a la doctrina del cobro de lo indebido, el Art. 1795 del Código Civil (1930) establece que "[c]uando se recibe alguna cosa que no había derecho a cobrar, y que por error ha sido indebidamente entregada, surge la obligación de restituirla". 31 LPRA sec. 5121. A tales fines, esta figura, derivada del enriquecimiento injusto, aplica cuando surgen las siguientes circunstancias: *(*1) se produjo un pago con la intención de extinguir una obligación; (2) el pago realizado no tenía una justa causa, es decir, que no existía obligación jurídica entre el que paga y el que cobra, o si la obligación existe, que sea por una cuantía menor a la pagada, y (3) el pago fue hecho por error y no por mera liberalidad o por cualquier otro concepto. *PRHOA v. Confederación Hípica*, 202 DPR 509, 523 (2019); *E.L.A. v. Crespo Torres*, 180 DPR 776, 793-794 (2011).[9]

Cónsono con lo anterior, la obligación de restitución opera cuando se hizo un pago con la intención de extinguir una obligación, pero no existía una obligación jurídica entre las partes, o si existía dicha obligación, el pago fue realizado por una cuantía mayor a la debida. *Pagán Santiago et al. v. ASR*, 185 DPR 341, 367 (2012). No obstante, es menester puntualizar que, "[p]ara efectos de la restitución, ya no existe en el derecho puertorriqueño distinción entre errores de hecho y errores de derecho". *PRHOA v. Confederación Hípica, supra,* a la pág. 523; *E.L.A. v. Crespo Torres, supra,* a la pág. 797.

**C.**

Es norma reiterada que, las corporaciones gozan de personalidad jurídica distinta y separada de sus dueños. *Colón y*

---

[9] En *E.L.A. v. Crespo, supra,* el Tribunal Supremo de Puerto Rico eliminó la distinción entre error de derecho y error de hecho. Pautó que si el pago se efectuó por error debe restituirse sin distinguir su categorización. **Aplicamos tal razonamiento a este caso, pues según el Máximo Foro puertorriqueño, esta norma opera de modo prospectivo, como ocurre en el caso presente.**

*otros v. Báez y otros*, 214 DPR 1062, 1083 (2024); *Santiago et al. v. Rodríguez et al.*, 181 DPR 204, 214 (2011). En efecto, la corporación facilita el desarrollo de empresas, pues tiene una personalidad jurídica distinta a la de sus miembros o dueños, quienes, por lo general, no responderán con sus bienes personales por los actos de la corporación, sino hasta el monto de su inversión. *Santiago et al. v. Rodríguez et al.*, *supra*, a la pág. 214 (citando a C.E. Díaz Olivo, Corporaciones, San Juan, Publicaciones Puertorriqueñas, 2005, pág. 119).

Ahora bien, esta norma no es absoluta. Nuestro ordenamiento ha adoptado por la vía jurisprudencial la doctrina del descorrimiento del velo corporativo. Esta doctrina postula que, se descartará la personalidad jurídica del ente corporativo, si los accionistas emplean la corporación como un *alter ego* para evitar un fraude o la realización de un propósito ilegal o para evitar una clara inequidad o mal ("wrong"). *D.A.C.O. v. Alturas Fl. Dev. Corp. y otro*, 132 DPR 905, 925 (1993) (citando a *Cruz v. Ramírez*, 75 DPR 947, 954 (1954)). Así pues, la ficción jurídica de una corporación no se sostendrá si ello equivale a: (1) sancionar un fraude, (2) promover una injusticia, (3) evadir una obligación estatutaria, (4) derrotar la política pública, (5) justificar la inequidad, (5) proteger el fraude o (6) defender el crimen. *Srio. D.A.C.O. v. Comunidad San José, Inc.* 130 DPR 782, 798 (1992). Véase, también, *Santiago et al. v. Rodríguez et al.*, *supra*, a la pág. 223 esc. 4.

En armonía con lo anterior, el profesor Díaz Olivo explica que en ciertos contextos en los que medie una conducta fraudulenta o dolosa, procede el descorrimiento del velo corporativo:

> *Al examinar las decisiones judiciales que atienden reclamos de descorrer el velo corporativo, encontramos que el elemento más fuerte y convincente para hacer responsables a los accionistas por las deudas de la corporación es la existencia de conducta fraudulenta o*

*dolosa por parte de los accionistas para con los acreedores. El surgimiento de un crédito contra una corporación es, de ordinario, precedido por un proceso de negociación entre el acreedor y el deudor potencial. Durante este proceso, la corporación como deudor potencial, suele hacer representaciones a la persona o entidad de quien solicita financiamiento por medio de sus agentes o representantes quienes con frecuencia son sus propios accionistas. Si el acreedor confía en estas representaciones y luego resulta que son falsas o no del todo correctas y por tal razón su crédito adviene incobrable, entonces surge un fundamento racional y jurídico para hacer responsables personalmente a estos accionistas frente al acreedor. Si los accionistas fueron los responsables de inducir al acreedor a contratar mediante una gestión engañosa o dolosa, justo es que respondan frente a estos de las consecuencias de su actuación.* C.E. Díaz Olivo, <u>Corporaciones: Tratado Sobre Derecho Corporativo</u>, 3da ed. rev., Ed. AlmaForte, 2022, a las págs. 131-132.

No obstante, en *Fleming v. Toa Alta Develop. Corp.* 96 DPR 240, 244 (1968), el Tribunal Supremo de Puerto Rico resolvió que, la mera alegación de una deuda corporativa impagada no responsabiliza directamente a sus directores. Agregó que, "[s]i así fuese se destruiría el principio de responsabilidad limitada que es consustancial con la ficción corporativa". Íd. Por consiguiente, el peso de la prueba no se descarga con la mera alegación de que la empresa es un *alter ego*, sino con prueba concreta que demuestre que la personalidad de la corporación y la del accionista no se mantuvieron adecuadamente separadas. *D.A.C.O. v. Alturas Fl. Dev. Corp. y otro, supra,* a la pág. 927.[10]

**D.**

En nuestro esquema procesal, las costas constituyen aquellos gastos incurridos por la tramitación de un pleito, los cuales un litigante debe reembolsar por mandato de ley o por determinación discrecional del juez. *ELA v. El Ojo de Agua Development,* 205 DPR 502, 527 (2020), (citando a R. Hernández Colón, <u>Práctica Jurídica de Puerto Rico: Derecho Procesal Civil</u>, 6ta

---

[10] En aras de cumplir con el estándar probatorio, la parte interesada en descorrer el velo corporativo desfilará prueba fuerte y convincente que justifique rasgar el velo corporativo. Véanse *González v. San Just Corp.* 101 DPR 168, 172 (1973); *San Miguel Fertil. Corp v. P.R. Drydock,* 94 DPR 424, 430 (1967).

ed., San Juan, Ed. LexisNexis, 2017), Sec. 4201, pág. 426). A esos fines, la Regla 44.1(a) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1(a), faculta al foro primario a imponer el pago costas. La precitada regla tiene dos propósitos, a saber: (1) restituir lo que una parte perdió por hacer valer su derecho al ser obligada a litigar, y (2) servir como disuasivo para la litigación inmeritoria, temeraria, o viciosa que se lleva a cabo con el propósito de retrasar la justicia. *Class Fernández v. Metro Health Care*, 214 DPR 348, 362 (2024). *Rosario Domínguez et als. v. ELA et al.*, 98 DPR 197, 211 (2017). Es decir, este precepto goza de una función reparadora, toda vez que permite el reembolso de los gastos necesarios y razonables que tuvo que incurrir la parte prevaleciente al tramitar su pleito. *Rosario Domínguez et als. v. ELA et al.*, *supra*; *Maderas Tratadas v. Sun Alliance et al.*, 185 DPR 880, 934 (2012).

Una vez reclamada la imposición de costas a beneficio de la parte prevaleciente resulta mandatoria. *Maderas Tratadas v. Sun Alliance et al.*, *supra,* a la pág. 934. Véase, además, *J.T.P. Dev. Corp. v. Majestic Realty Corp.*, 130 DPR 456, 460 (1992). Ahora bien, la imposición del pago de costas no opera automáticamente, pues es necesario que la parte prevaleciente cumpla con el procedimiento dispuesto en la Regla 44.1(b) de Procedimiento Civil, 32 LPRA Ap. V, R. 44.1(b), *ELA v. El Ojo de Agua Development*, *supra,* a la pág. 528; *Rosario Domínguez et als. v. ELA et al, supra,* a la pág. 212.

En efecto, "el tribunal tiene amplia discreción para evaluar la razonabilidad y determinar la necesidad de los gastos detallados". *Rosario Domínguez et als. v. ELA et al.*, *supra*, a la pág. 212. Sobre este particular, nuestro Foro Supremo estatal ha delineado una serie de criterios para identificar qué es un gasto razonable y necesario:

*Cónsono con lo anterior, hemos resuelto que no todos los gastos del litigio son recobrables como costas. Por consiguiente, solo son recobrables aquellos gastos necesarios y razonables para la tramitación del pleito, procedimiento o apelación que un litigante debe reembolsar a otro. A modo de ejemplo, este Tribunal ha determinado que los siguientes gastos son recobrables: sellos de radicación de las alegaciones, sellos cancelados en las mociones, gastos de emplazamiento, sellos cancelados para efectuar embargos, transcripción de evidencia, deposiciones, entre otros.*

*Por el contrario, como excepción, no serán recobrables los gastos ordinarios de oficina de los abogados de las partes. Class Fernández v. Metro Health Care, supra,* a las págs. 362-363.

Sin embargo, no son incluibles como costas los gastos de transcripciones de récords de vistas cuando tales transcripciones se solicitan por resultar convenientes, mas no necesarias para los reclamantes. Íd. Ahora, el gasto para obtener deposiciones es recobrable si resulta necesario, aunque no se use en las vistas del caso. Íd. Finalmente, la resolución emitida por el foro primario respecto a la imposición del pago en concepto de costas podrá ser revisada por este Tribunal de Apelaciones en virtud del recurso de *Certiorari. ELA v. El Ojo de Agua Development, supra,* a la pág. 52.

**III.**

Examinado con sumo cuidado el expediente ante nos, determinamos que el foro primario actuó correctamente al dictar Sentencia a favor de Tropical Fruit. Adelantamos que, la prueba presentada en el juicio demostró que el Sr. Torres Torres, mediante la Corporación Torres & Torres, incurrió en cobro de lo indebido al sobrefacturar la suma de $80,286.00 sin justificación alguna. Veamos.

En primer lugar, nos corresponde discutir los señalamientos de error (1), (2), (3), y (4), concernientes a los argumentos de naturaleza probatoria. En los señalamientos de error (1) y (2), la parte apelante señala que, incidió el foro primario al no admitir como evidencia las copias de las facturas, los memorandos de

créditos, los cheques, el resumen de horas y las tareas de los trabajos. No le asiste la razón. Respecto a estos argumentos, precisamos que, la disposición de este caso estuvo fundamentada en la amplia prueba pericial, documental y testimonial sometida por Tropical Fruit, la cual mereció íntegra credibilidad por parte del TPI. Véanse *Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778 (2022).[11] De hecho, un análisis detenido de la Transcripción de la Prueba Oral nos confirma que, la parte apelante no invocó el fundamento de pertinencia a tenor con la Regla 401 de las Reglas de Evidencia, 32 LPRA Ap. VI, R. 401. para presentar tal evidencia. Ante ello, oportunamente Tropical Fruit invocó de modo correcto la objeción de mejor evidencia.[12] Por ende, colegimos que tales errores no se cometieron.

Así resuelto, atendamos el señalamiento de error (3), en el cual la parte apelante argumenta que, incidió el tribunal sentenciador al hacer referencia en el dictamen apelado al pago $225,000.00 emitido a su favor, y no permitirle pasar prueba al respecto. En consideración a ello, revisamos la prueba oral transcrita, y notamos que el foro primario en corte abierta dispuso que se permitiría la alusión a tal cuantía solo para fines del Informe Pericial sometido por la parte apelada.[13] Además, el TPI puntualizó que dicha cuantía se está dilucidando en un caso independiente, por lo que, no se incluiría como parte del remedio legal. Por tanto, concluimos que ese error no se cometió.

Ahora, pasemos al señalamiento de error (4), en el cual la parte apelante sostiene que, el TPI debió otorgar credibilidad a la carta 8 de enero de 2008 (Exhibit 11 de la parte apelante). A tales

---

[11] **El Foro Supremo estatal ha establecido que debemos ser deferentes a la apreciación de la prueba por parte del TPI, salvo media error, prejuicio, parcialidad o abuso de discreción**. Véanse *Peña Rivera v. Pacheco Caraballo,* 213 DPR 1009, 1024 (2024); *Ortiz Ortiz v. Medtronic,* 209 DPR 759, 778 (2022).
[12] Véase Transcripción de la Prueba Oral, págs. 510-512.
[13] Véase Trascripción de la prueba oral, pág. 346.

efectos, efectuamos una lectura detenida de ese documento, sin embargo, este no evidencia que Tropical Fruit haya autorizado a la entidad corporativa a incurrir en los pagos en exceso. Además de ese escrito, revisamos (1) el contrato de servicio del 8 de enero de 2008 (Exhibit 4 Estipulado de la parte apelada), (2) la propuesta para la creación de clasificación de empleados del 30 de junio de 2008 (Exhibit 1 Estipulado de la parte apelada), (3) la propuesta para la compilación de proyecciones del 10 de julio de 2009 (Exhibit 2 Estipulado de la parte apelada), y (4) la propuesta para la compilación de proyecciones del 15 de septiembre de 2011 (Exhibit 3 Estipulado de la parte apelada). **No obstante, subrayamos que, nada en la prueba documental y testifical nos revela que mediaba un consentimiento por parte de Tropical Fruit, que permitiera a la entidad apelante a facturar en exceso.[14]** Por ello, nos corresponde ser deferentes ante el ejercicio de apreciación de la prueba asumido por el TPI.

Atendidos los asuntos probatorios, nos corresponde discutir conjuntamente los señalamientos de error (6), (7) y (8) concernientes a aspectos de derecho sustantivo. Al respecto, la parte apelante argumenta que, incidió el foro primario al determinar que incurrió en cobro de lo indebido y dolo, y en efecto, al ordenar el descorrimiento del velo corporativo. No existe fundamento jurídico para acoger su razonamiento.

A base de la evidencia presentada, reiteramos que la parte apelada comprobó que no existe un contrato que justifique el pago en exceso de $80,286.00.[15] Conviene resaltar que, el Informe Pericial sometido por Tropical Fruit, constatado con la prueba testimonial del Sr. Quiñones Márquez, establece que el Sr. Torres

---

[14] **Destacamos que el Sr. Torres Torres, a preguntas del representante legal de la parte apelada, no demostró que existía un contrato para emitir tales pagos en exceso. Véase Transcripción de la prueba oral, a las págs. 622-624.**
[15] **De acuerdo con el Informe Pericial del contable autorizado, el Sr. Quiñones Márquez, la corporación Torres & Torres sobrefacturó $305, 286.00, de los cuales se descontaron $225,000.00. Esta última suma es objeto de otro litigio independiente al caso**. Véase Exhibit I de la parte apelada.

Torres, por medio de su corporación, facturó cantidades que excedían a las contratadas, sin explicación adecuada y sin proveer evidencia sobre los servicios que alegó rendir.

Por tanto, un análisis de la totalidad de esa prueba nos conduce a determinar que: (1) la parte apelada produjo un pago con la intención de extinguir una obligación, (2) el pago realizado no tenía una justa causa, y (3) fue emitido por error, y no por liberalidad. Por consiguiente, nos compete sostener la decisión impugnada, cuyos fundamentos parten de una realidad fáctica sustentada por amplia evidencia pericial, testimonial y documental.

Razonamos, a su vez, que la actuación del Sr. Torres Toreres, por conducto de Torres & Torres, denota una conducta dolosa. Ello, pues, amparado en la figura corporativa, sometió ante Tropical Fruit una serie de documentos bajo el subterfugio de que constituían propuestas de sus servicios. Sin embargo, tal proceder generó un esquema de maquinaciones insidiosas a los fines de que la parte apelada emitiera unos pagos en exceso y contrario a la buena fe.

En consecuencia, contemplamos que este escenario antijurídico motivó correctamente al foro primario a descorrer el velo corporativo en contra del Sr. Torres Torres, quien es principal accionista de Torres & Torres. Surge de la prueba obrante en el expediente judicial, que dicho accionista utilizó como *alter ego* su corporación para efectuar una serie de gestiones engañosas derivadas del dolo y en beneficio propio. Es decir, notamos que no existía una separación adecuada entre la corporación apelante y su accionista. **Enfatizamos, pues, que las actuaciones de este último provocaron que Tropical Fruit le entregara una suma en exceso de $80,286.00, producto de una facturación no justificada, según se identificó en el Informe Pericial de**

**Tropical Fruit.  Ante tal contexto, no vemos limitación jurídica que impida el descorrimiento del velo corporativo**. Así subrayado, disponemos que no se cometieron los errores 6, 7, 8, y 9.

Resueltos tales asuntos, pasemos a discutir brevemente los señalamientos de naturaleza procesal recogidos en los señalamientos de error (5) y (9), sobre una Resolución emitida el 7 de octubre de 2021, que denegó una solicitud de sentencia sumaria.  En esencia, la parte apelante sostiene que el TPI erró al acoger unas determinaciones que constaban en el dictamen aducido.  Nuevamente, no le asiste la razón. Al evaluar el expediente, contemplamos que, el foro primario, al amparo de la Regla 36.4 de Procedimiento Civil, 32 LPRA Ap. V. Regla 36.4[16], acogió específicamente las determinaciones de hechos no controvertidos, según permite nuestro esquema procesal. Además, un examen de *novo* de la totalidad del expediente nos revela que, las determinaciones no controvertidas surgen de la totalidad de la prueba presentada. Por tal motivo, concluimos que no se cometieron los señalamientos de error (5) y (9).

Por último, nos corresponde discutir conjuntamente los señalamientos de error contenidos en el segundo recurso presentado por la parte apelante atinentes al memorando de costas.[17] Veamos.

Surge del expediente ante nuestra consideración que, el foro primario impuso el pago total de $65,258.60 en concepto de costas.  En efecto, contemplamos que, Tropical Fruit presentó amplia prueba documental, tales como recibos, reportes de costos

---

[16] La precitada regla dispone que, "[a]l celebrarse el juicio, se considerarán probados los hechos así especificados y se procederá de conformidad". 32 LPRA Ap. V, R. 36.4.

[17] **Advertimos, contrario a lo indicado por la parte apelante, que la suspensión de los procedimientos no se extendía al trámite de notificación de la Resolución recurrida. Ello, pues, el asunto de costas no estaba contemplado en el escrito apelativo cuando este se presentó ante nos. Por ende, colegimos que el TPI tenía jurisdicción al emitir la notificación de dicha Resolución**. Véase Regla 52.3 de Procedimiento Civil, 32 LPRA Ap. V, R. 52.3.

y facturas, para demostrar que, los siguientes gastos resultaron necesarios y justificados en la tramitación de su pleito: (1) $400.33 (copiadora Doubledey), (2) $213.20 (deposición del perito CPA Roberto Luciano), (3) $1,085.50 (deposición del Sr. Torres Torres), (4) $377.00 (fotocopias internas); (4) $1,396.00 (servicios de mensajería, radicación y emplazamiento, y (5) $323.60 en sellos y comprobantes.  Por ende, precisamos que, tales partidas no deben ser modificadas, pues están apoyadas en la totalidad de la prueba presentada por la parte apelada.

**No obstante, observamos que, el foro primario también concedió la suma de $61,462.97, en concepto de los gastos incurridos por la contratación del perito Quiñones Márquez. Sin embargo, nos compete intervenir en tal determinación, toda vez que, la cuantía impuesta por razón de la contratación del perito no está debidamente justificada por la prueba documental sometida.  Por consiguiente, concluimos que, la suma total impuesta en concepto de costas debe modificarse a $3,795.63, en aras de garantizar el reembolso correcto de los gastos incurridos por la tramitación del pleito, según lo acredita la prueba documental obrante en el expediente ante nos.**

## IV.

Por los fundamentos que anteceden, los que hacemos formar parte de este dictamen, confirmamos la Sentencia emitida el 30 de mayo de 2025 por el Tribunal de Primera Instancia, Sala Superior de Ponce.  No obstante, modificamos la Resolución dictada el 25 de junio de 2025, a los únicos efectos de ajustar la cuantía total impuesta en concepto de costas a $3,795.63, en aras de garantizar el reembolso correcto de los gastos incurridos por la tramitación del pleito, según lo acredita la prueba documental obrante en el expediente ante nos.  Así modificada, se confirma.

Lo acordó y manda el Tribunal, y lo certifica la Secretaria del Tribunal de Apelaciones.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones